CASE 75—PETITION  EQUITY—JUNE 15.

# Schmidtz, &c. v. L. & N. R. R. Company.

### APPEAL FROM SHELBY CIRCUIT COURT.

1. RAILROADS—LEASES—DUTIES OF LESSOR AND HIS VENDEE—SPE-CIFIC PERFORMANCE.—The L. & N. R. R. Co., having purchased from the L. C. & L. R. R. Co. all of its property including a lease which it held on the property of the Cumberland & Ohio R. R. Co., and having taken charge of the said Cumberland & Ohio road thereunder, and having operated the same for a long time, and having elected to sue and recover from said Cumberland & Ohio R. R. Co., the sums due to the L. C. & L. R. R. Co., under the terms of the lease, the said L. & N. R. R. Co. assumed whatever obligations the L. C. & L. R. R. Co. were under by virtue of the lease and was not a tenant by suffer-ance; and the specific performance by the L. & N. R. R. Co. of the terms of the lease is adjudged, notwithstanding the fact that the original lessor had failed to perform its undertaking to furnish means with which to complete the construction of the road.

2. CONTRACTS—SPECIFIC PERFORMANCE.—There is no adequate relief to be had for the bond holders in this case, except by a specific performance of the contract, and the provisions of the contract being neither complicated nor difficult to perform it can, and should be enforced by a court of equity, and does not come with-in that class of cases where a court of equity will refuse specific performance of a contract calling for continuous services, in-volving skill and judgment, and requiring continuous supervis-ion on the part of the court. The contract in question may be

enforced either under the direct orders of the court, or by a receiver of the court at the cost and expense of appellee.

SIMRALL, BODLEY & DOOLAN, WILLIAM S. PRYOR, G. G. GILBERT, J. C. BECKHAM and WILLIAM BECKHAM for appellants.

HELM & BRUCE and H. W. BRUCE for appellee.
(Record and briefs not in the office.)

JUDGE GUFFY delivered the opinion of the court.

This action was brought in the Shelby Circuit Court by appellant, Schmidtz, Trustee, and the Northern Division of the Cumberland & Ohio Railroad Company, against the Louisville & Nashville Railroad Company, etc., to compel said Louisville & Nashville Railroad Company by mandatory injunction to continue to operate the northern division of the Cumberland & Ohio Railroad Company from Shelbyville to Bloomfield in accordance with a lease and contract set out in the petition.

It appears from the allegations of the petition that the northern division of the Cumberland & Ohio Railroad Company in 1879 leased to the Louisville, Cincinnati & Lexington Railway Company its road from Eminence to Bloomfield, as set out in the lease, which reads as follows:

LEASE OF C. & O. TO L., C. & L. RY. CO.

This indenture of a lease made and entered into by and between the northern division of the Cumberland & Ohio Railroad Company, of the first part, and the Louisville, Cincinnati & Lexington Railway Company, of the second part, both railroad corporations duly organized under the laws of the State of Kentucky.

Witnesseth: That for and in consideration of one dollar

cash in hand by the party of the second part, and in consideration of the mutual covenants and stipulations hereinafter contained, the said party of the first part does hereby lease to the said party of the second part all that part of the first party's unfinished road-bed, right of way, with improvements and appurtenances, depots and depot grounds, machinery, tools and implements, together with all its property, rights and franchises, including unpaid subscriptions to capital stock, dues, and demands ibelonging to or in any wise appertaining to the said first party's line of railway at the town of Eminence, Kentucky, thence southwardly through a portion of Henry County, and the counties of Shelby and Spencer, and to Bloomfield in the county of Nelson, and the State of Kentucky, for the period of thirty years from the date of full execution hereof, upon the terms, conditions and stipulations hereinafter set out.

1. Under directions of the stockholders of said first party, its president and directors will execute a mortgage upon all the property, rights and franchises belonging to or in any wise appertaining to said first party's line of road hereinbefore described, for the security of $350,000 of mortgage coupon-bonds, having twenty years to run and bearing interest at the rate of seven per cent. per annum interest payable on the 1st days of June and December, of each year, all of which is fully set out in said mortgage.

Now said bonds and coupons are to be fully prepared. signed and countersigned and made ready for use, as in the charter of said first party and said mortgage provided, and the same will be delivered to said second party within sixty days after the delivery of this lease.

2. Said second party hereby binds and obliges itself that said bonds, or proceeds of such as are sold, shall be used by it in the construction of said first party's line of railway, as provided in this lease, and for no other purpose whatever. It is agreed that enough of said bonds may be sold or used in and about contracts, for work, labor, or materials to complete said line of railway, at not less than————cents to the dollar; and whatever of said bonds or proceeds, after deducting all sums due said second party, may not be so used, shall,*after said completion, after cancellation of bonds, be turned over to said first party and such surplus bonds destroyed.

3. A fundamental condition of this lease is that if said second party shall not be able to dispose of bonds amounting at their face value to $250,000, the proceeds to be in money, material, or labor, by or before the 1st day of September, eighteen hundred and eighty, then this lease terminates, and the parties hereto are released, and said second party is to restore to said first party all bonds; provided, however, that no absolute sale of any of said bonds shall be made by said second party unless and until it can place not less than two hundred and fifty thousand dollars in the value thereof in money or its equivalent; and when that quantity of said bonds have been disposed of by said second party, it shall, as soon as practicable, and not later than the 1st day of September, eighteen hundred and eighty, begin the construction of said first party's said line. of railway; and a failure to begin work within said time shall operate as a termination of this lease.

Whenever said $250,000 of said bonds shall have been

disposed of as aforesaid, this contract becomes absolute and binding on the parties hereto, and the construction of said line of railway from Eminence to Bloomfield shall be commenced; and when the construction of said line of railroad is begun, the same shall be pushed to completion as rapidly as possible; and a failure on the part of the party of the second part to so complete the same as to allow the safe and regular passage of trains to and from Eminence and Bloomfield within two years from the commencement of work thereon shall at the option of said first party, after six months notice of its election so to do, operate as a forfeiture of this lease. None of said bonds shall be sold with past due coupons annexed therto; but before selling, all past due coupons shall be cut off, cancelled, and returned by said second party to said first party.

4. When commenced, said construction shall be pushed as rapidly as possible, with due regard to the greatest economy; and the work and superstructure is to be as for a first-class single track railway, with the same gauge as the track of said second party's line of railway.

5. It is further agreed that said second party shall furnish all the necessary locomotive engines and rolling stock to operate said line of railway; and for the use of same said second party is to receive out of the gross earnings of said first party's line of road the cost of the wear and tear to such engines and rolling stock as may be so furnished.

But the first party reserves the right to furnish all, or so much as it can, of said rolling stock, and when so furnished said first party shall receive the same compensation there-

for as is received by said second party on its rolling stock used on said line.

6. It is further agreed and understood, that in the operation of said line of railway said second party will make to said first party quarterly returns, giving full details of earnings and operating expenses, including the expense of keeping road-bed in order; and the net profits arising therefrom shall be applied to the payment of interest and providing for sinking fund, and retiring said mortgage bonds.

But out of the gross earnings shall be first deducted annually the sum of $1,000, which shall be paid to said first party, with which to pay the expense of keeping up its organization; and if the net earnings do not prove sufficient to pay the interest and provide for the sinking fund on said mortgage bonds, then said second party, if all other sources of raising money of said first party prove insufficient, will supply the deficiency, so far as it may be done, by appropriating the net earnings, or so much as may be needed, on its own lines, which may accrue by reason of business coming to it from or over said first party's line.

This pledge and assignment shall be made effectual by mortgage properly executed, acknowledged, and recorded; and should it become necessary to use any of the net earnings on the lines of the second party to pay said interest and sinking fund, or any part of either, then all amounts so used, as well as all monies paid for said first party by said second party, shall be treated as interest bearing debts, interest at the same rate with said mortgage bonds, payable half yearly, and to run from date of such payments, the debt and interest to be repaid out of said net earnings

thereafter accruing to said first party on its own line, which may be so appropriated consistently with the other provissions of this lease; and for all sums or any sums of money that may become due from said first party to said second party on its or any account, a lien is hereby created upon all the property, rights and franchises of said first party owned or to be acquired in favor of said second party, to stand next in priority to said mortgage and bonds for $350,-000 as aforesaid.   But said second party shall not enforce the collection of said debts, or any of them, by enforcement of said lien until at least eight years have elapsed from and after the date of the creation of the same.

7. It is further agreed and understood, that whenever the net earnings from the leased premises shall be sufficient to pay off the interest and sinking fund on said mortgage bonds for $350,000, or such portion thereof as is outstanding, and to repay said second party all dues and demands then due or owing, the surplus net earnings, unless used in retiring said bonds as provided in said mortgage less one-tenth thereof, shall be paid over to said first party, the one-tenth of said net earnings to be retained by said second party for its own use.

8. It is further agreed and understood, that so long as said second party may operate said leased line of railway, no greater rate of charges, either for freight or passage thereon, shall be demanded or received under its regular tariff on its own lines of railway for local freights and passage.

9. It is further agreed and understood, that said first party assigns, transfers and sets over to said second party all claims, dues and demands, choses in actions, unpaid sub-

scriptions to capital stock (except private subscriptions and all evidences thereof) of every kind and character, to be by said second party collected by suit or otherwise, with power to settle, compromise, arbitrate or adjust as to it may seem best; but this assignment and transfer does not become absolute (except as to so much thereof as may be necessary to refund and indemnify to said second party the cost of printing and issuing said mortgage bond or incidental thereto, which is absolute), until said second party give notice in writing to the president of said first party that said $250,000 of said mortgage bonds have been disposed of as hereinbefore provided; and then and after such notice said second party may at once proceed as provided under the clause of this lease.

10. It is further agreed and understood, that this lease is not assignable without the consent of the grantor; that during the existence of said lease the second party will pay all taxes lawfully assessed against said leased premises, the amount thereof to be charged to operating expenses; and at the termination thereof said leased premises shall be restored to said first party in good repair, unless the same be extended or renewed by mutual consent, or unless prevented by unavoidable casualty, legal proceedings or operation of law.

11. The second party hereby agrees to furnish any means necessary to complete said first party's line of road from Eminence to Bloomfield which may not be derived from the sale of the bonds to be issued by said first party, and also to furnish any means necessary to pay any interest which may become due on said mortgage bonds previous to the completion of said first party's line of road, which may not

be derived from the earnings of said line of road. Any means so furnished by said second party is to become a lien debt due to said second party by said first party, and payable upon the same terms and conditions as hereinbefore provided as to the other indebtedness.

12. If said second party be hindered or delayed in beginning or completing said line of railway by act or omission of said first party or by legal or equitable proceedings, then the period or periods of such delay shall not be counted as part of the time within which said second party is to do or perform any acts or things under this contract.

In testimony whereof, the said second party, acting under authority and approval of its stockholders duly had in stockholders' meeting assembled, on the 24th day of June, eighteen hundred and seventy-nine, has caused these presents to be signed in duplicate, in its corporate name, by its president and countersigned by its secretary, and its corporate seal hereto affixed; and the said second party, acting under authority and approval of its stockholders, duly had in stockholders' meeting assembled, on the 28th day of July, eighteen hundred and seventy-nine, has caused these presents to be signed in duplicate in its corporate name, by its president and countersigned by its secretary, and its corporate seal hereto affixed, this ————— day of —————, 1879.

It will be seen from said lease that it first contemplated building the road from Eminence to Bloomfield, but afterwards the contract was modified, as shown by the contract, which reads as follows:

Modification of lease—This contract, made and entered into by and between the Northern Division of the Cumber-

(29)

land & Ohio Railroad Company, of the first part, and the Louisville, Cincinnati & Lexington Railway Company, party of the second part (both railway corporations duly incorporated under the laws of the State of Kentucky), and Joshua F. Speed, trustee, party of the third part.

Witnesseth: That for and on account of the difficulties of carrying into effect the contract of the parties of the first and second parts hereto, in relation to the lease, construction and operation of said first party's proposed line of railway from Eminence to Bloomfield, of date the 28th day of July, one thousand eight hundred and seventy-nine, said parties have and do hereby agree upon the following changes and modifications of said contract and the mortgage therein named, to take effect when and as soon as this change and modification shall have been duly and properly approved by a majority of the stockholders of each of said companies, and fully executed and recorded in the proper offices, when to all intents and purposes the said contract so amended and modified shall be regarded and taken as the true contract and agreement between the parties hereto.

1. Whenever said second party shall be able to dispose of said mortgage bonds, provided for in said contract and mortgage, amounting at their face value to the sum of $150,000, (one hundred and fifty thousand dollars), and said bonds numbered from one to one hundred and fifty inclusive, the proceeds in money, labor or materials, the same may be done, and then this contract as amended and in all its particulars becomes absolute, and the construction of that portion of said first party's line of railway between Shelbyville and Bloomfield shall be commenced and pushed to completion as rapidly

as possible; and a failure to complete said road so as to permit the safe and regular passage of trains between Shelbyville and Bloomfield within two years from the commencement of the work thereon shall, at the option of said first party after six months' notice thereof, operate as a forfeiture of said lease; but no disposition of any of said bonds shall be made until not less in amount than $150,000 (one hundred and fifty thousand dollars) of the face value thereof, numbered as aforesaid, can be placed for money or its equivalent.

2. Not more than $250,000 (two hundred and fifty thousand dollars) of the face value of said bonds, numbered from one to two hundred and fifty inclusive, shall be used or disposed of in and about the construction of said railroad between Shelbyville and Bloomfield, and $100,000 (one hundred thousand dollars) of the face value of said bonds, numbered from two hundred and fifty-one to three hundred and fifty (both inclusive), shall be set apart and faithfully preserved in such manner as the board of directors of the first and second parties may agree, for the ultimate construction of said first party's road between Eminence and Shelbyville; but said second party shall not be bound to begin the construction or operation of said last named portion of said railroad until, in the judgment of the board of directors of the said second party, the operation of the same would result in sufficient earnings to pay operating expenses and interest and sinking fund on the amount required to complete the same; and the mortgage heretofore made to Joshua F. Speed, trustee therein, is hereby so modified that the said two hundred and fifty bonds to be used in constructing said railroad between Shelbyville and Bloomfield shall con-

stitute no lien on that part of said company's road between Eminence and Shelbyville until said one hundred bonds set apart for its construction shall have been used for that purpose, and then all of said bonds issued shall be a joint and equal lien on the whole property as set out in the original mortgage; and the said Speed, as trustee, is made a third party hereto, and shall sign this contract as evidence of his consent to the modification in this respect of the said mortgage, it being agreed and understood that at this date none of the said mortgage bonds have been sold or disposed of, but remain in the hands of the said second party, provided that unless the second party shall complete the construction of so much of said first party's road as lies between Shelbyville and Eminence within five years from the first of September, one thousand eight hundred and eighty, then the lease of said last named part of said road shall determine and terminate at the option of said first party after six months' notice, and in the event of such termination of the lease, said bonds, numbered from two hundred and fifty-one to three hundred and fifty, both inclusive, as aforesaid, and the coupons thereof, shall at once be canceled so as to prevent their circulation, or if the boards of the parties aforesaid so order it they shall be destroyed.

3. Before any of the said bonds, numbered from one to two hundred and fifty, both inclusive, shall be sold or disposed of, each shall have a printed or lithographed indorsement thereon to the effect that none of them or their coupons have any lien upon the company's property, or franchise or line of road from north of Shelbyville until the one hundred bonds aforesaid are issued or used, and that por-

tion of said road between Shelbyville and Eminence shall have been completed, and then all of said bonds and coupons shall have a common and joint lien on the whole property.

4. The boards of directors of the first and second parties may agree to the use of the second-hand rails to be sufficient for the safe transmission of trains, and to be removed and replaced as fast as they become unsafe. The price of said second-hand rails to be agreed upon by said boards before being used.

5. In all respects in which this contract is inconsistent with the original contract or mortgage, said originals are abrogated and the contract as modified and amended by this agreement shall be taken as the true existing contract between the parties.

In testimony whereof the said first and second parties, acting under directions of their respective stockholders, have each caused this contract to be signed with their corporate names and seals annexed by their respective presidents, and countersigned by the secretaries, and also duly signed by the said Joshua F. Speed.

### MORTGAGE OF C. & O. R. R. CO.

This indenture, made and entered into this the 2nd day of July, in the year of our Lord, one thousand eight hundred and seventy-nine, between the Northern Division of the Cumberland & Ohio Railroad Company, a corporation duly organized under the laws of the State of Kentucky, party of the first part, and Joshua F. Speed, as trustee, party of the second part,

Witnesseth: That for and in consideration of one dollar

.paid cash in hand paid by the party of the second part to the party of the first part; and whereas, it is provided in the charter of the said party of the first part that it might issue mortgage bonds to complete its road, to the extent of $15,000 per mile, upon all its property, rights, and franchises; and, whereas, the stockholders and board of directors of said first party have determined to issue such mortgage bonds to the extent of $350,000, bearing interest at the rate of seven per cent per annum, interest payable half-yearly, and bonds being of even date with the said mortgage, and to be paid at the end of twenty years from their dates, and have determined that such mortgage shall be executed and bonds issued by minutes duly entered upon their record books, and have directed the preparation of said bonds; and the same have been prepared, aggregating the said sum of $350,000, and divided into bonds of the denomination of $1,000 each, making three hundred and fifty bonds, numbered from one to three hundred and fifty, both inclusive, and lettered A.; all of said bonds have interest coupons annexed thereto, to fall due on the first day of June and December of each year, interest and principal payable in the city of New York. And the said bonds have been duly executed, and are now about to be delivered for the purpose of being sold in order to complete their line of railway, as specified in the lease this day made, from said Northern Division of the Cumberland & Ohio R. R. Co. to the L., C. & L. Ry. Co.

Now, therefore, for the equal security of each of said bonds at maturity, and the payment thereon of interest as the same matures, the said first party has this day bar-

gained and sold, and does hereby bargain, sell, and convey unto the said party of the second part, all the property, rights and franchises of the said Northern Division of the C. & O. R. R. Co., including all the right, title and interest of said company, free from all liens, mortgage or claims of any kind, and in and to its line of railroad, from its point of intersection with the line of road of the said L., C. & L. Ry. Co., in the town of Eminence, and the county of Henry, and State of Kentucky, through the counties of Henry, Shelby and Spencer,and to Bloomfield, in Nelson county, Kentucky, together with all its improvements and appurtenances, rights of way, lands adjacent thereto, machinery, tools, implements, fixtures, furniture and materials, and supplies of every description, so as to vest in the said party of the second part all the right, title and interest of the said Northern Division of the C. & O. R. R. Co. in and to all property owned by it, or in which it has any interest at the date of the execution of this instrument, or hereafter to be acquired by the said first party.

To have and to hold the same to the said party of the second part, his successors and assigns, forever. It is expressly to be understood, and is hereby declared to be the true intent and meaning of these presents, that the said second party shall have and hold the premises hereby granted or covenanted so to be, as trustee, for the joint and equal benefit and security of all such persons as may hereafter become the legal holders of any of the bonds aforesaid, and for the security of the principal and interest of each of said bonds, without regard to the time at which the said holders may become possessed thereof; provided,

always, that the said first party, its lessees or assigns, shall have and retain exclusive possession, control and management of said premises until default made as hereinafter provided, and possession taken in consequence thereof, and may, with the approval and concurrence of said second party, sell or lease, and make conveyance of any portion of said premises which may be found unnecessary to the workings of said road, the proceeds of such sale being reinvested in other real estate, subject to the same trust, or in liquidation of so much of the bonds issued hereunder; such re-investment being made also with the approbation of said second party, but without the purchaser being required to look to the re-investment.

And provided further, that if said party shall well and truly pay the several installments of interest on said bonds, and each of them, as the same shall become due, then this indenture shall be void and of no further effect.

In the event of the failure of the said first party to pay any part of any installment of said interest for more than sixty days after the same shall have become due and been demanded at the place where the said interest shall be properly payable, or in the event of its failure to pay any portion of said principal for more than ninety days after the same shall have become due and payable, and been demanded at the place where same shall be payable, then, and in either event, it shall and may be lawful for the said second party, and his successors in the trust hereby created (upon request thereto made in writing by any person holding any of said bonds, in the payment of principal or interest of which default shall have been made as aforesaid), to

enter upon and take possession of the railroad, property, and franchises hereby granted or covenanted so to be, and to hold, use, operate and manage the same for the joint and equal benefit of all the holders of all of said bonds. And upon such default, and request made and possession taken, the profits arising from the operation and use of the premises shall be appropriated by the party of the second part, as follows, to-wit: 1. To the payment of the expenses of the trust, including a fair and reasonable compensation to the trustee for his services.  2. If there be any surplus remaining, then to the payment of the interest in arrears on said bonds.  3. If there be still a surplus, then to the payment of the accruing interest on said bonds as it falls due, and to the payment of the principal of said bonds as it shall fall due.

But in the event that after such default, and request made and possession taken, it shall become necessary or desirable to sell the premises in order to the more prompt payment of the interest and principal of said bonds, then it shall and may be lawful for second party (upon request made in writing by persons legally holding said bonds to the extent of a majority of the bonds outstanding) to sell the said premises to the highest bidder, upon such terms as not being inconsistent with this indenture, or the tenor or effect thereof, may be determined on by said second party and the person or persons holding said bonds.  Said sale may be made for the whole amount of the principal and interest then accrued upon the  whole issue of said bonds outstanding, treating the principal as become due by reason of the default in the payment of interest.  And the whole

purchase money may be required to be paid by the purchaser in the payments not less favorable to him than one-third in cash, and the remainder in one and two years from day of sale, with interest from said day; or the purchaser may be required only to pay in like brief periods the interest then accrued and in arrears, and to secure the payment of the principal and accruing interest as they shall become due. But in any sale which may be made, a lien shall be retained on the premises to secure the unpaid purchase money, and there shall likewise be reserved a power of re-sale in case of default in the payment of the purchase money.

Said sale shall be made in the city of Louisville, and notice of the time, place, and terms of sale shall first have been given by public advertisement for at least four months in one or more newspapers published in each of the cities of Louisville, Lexington, Cincinnati, and New York. The money arising from any such sale shall be applied (1) to the payment of any interest which may be in arrears upon said bonds, and the expenses of executing the trust, including herein a fair and reasonable compensation to the trustee for his services; (2) to pay the principal of said bonds, or if there be not sufficient to pay them in full, then to their payment pro rata.

And on such sale being made, it shall and may be lawful for said second party, by the execution of all needful and proper instruments of conveyance, to vest in the purchasers the full and perfect title to the premises, subject only to the lien and power of re-sale aforementioned.

And said first party does hereby covenant to and with

said second party, his successors and assigns, that it will, on reasonable request thereto, make, do and execute such other and further deeds of conveyance and assurance of the premises, and particularly of the property, rights and franchises hereafter to be acquired by them, as to the said second party, his successors and assigns, shall seem necessary and proper fully to effectuate the true meaning and intent of this indenture.

And it does further covenant to and with the said second party, his successors, etc., that it will annually, commencing not later than the first day in January, one thousand eight hundred and eighty-three, appropriate from the earnings of said road a sum not less than $5,000, which sum shall be annually expended in the purchase and redemption of said bonds, or in the purchase of other interest-bearing securities approved by said second party, so as to form a sinking fund for the payment of the principal of said bonds when it shall become due.

It is further agreed and understood, that said first party, or its lessee or assigns, shall have the option, at any time after the first of January, one thousand eight hundred and eighty-three, to redeem and take up said bonds, or any of them, by paying par and accrued interest to date of notice of redemption therefor. If election is made so to redeem, notice thereof shall be sufficient if given by advertisement in some daily newspaper published in the city of Louisville for thirty days; and after the expiration of said thirty days, the bonds called for, and the sums due as interest shall cease to bear interest. But said bonds shall be called for in the order of their numbers, beginning at number one and fol-

lowing in numerical order. In order to the identification of the bonds whose payment it is intended hereby to secure, it is now declared that they shall each be sealed with the corporate seal of said first party, attested by the signature of the president, and countersigned by its secretary, and each certified on its face by the second party or his successor, to be one of the issue intended to be protected.

And it is further agreed by and between the parties to this indenture, that in the event of the death, resignation, failure or refusal to act, of the said second party, trustee as aforesaid, then it shall and may be lawful for the Shelby Circuit Court, upon the application of the parties holding said bonds, to the amount of $70,000, or more, to appoint a trustee or trustees in lieu and stead of said second party; and the trustee or trustees so appointed shall thereupon succeed to and be vested with all rights, powers, and privileges which are by this indenture conferred upon said second party, or intended so to be.

In testimony of all which, the said party of the first part, by its president and board of directors, and in pursuance to action of its stockholders duly had, has caused these presents to be sealed with its corporate seal, and signed with its corporate name, and countersigned by its Secretary, this second day of July, one thousand eight hundred and seventy-nine.

## MORTGAGE OF EARNINGS OF L., C. & L. RY. CO.

This indenture of a mortgage, made and entered into by and between the Louisville, Cincinnati & Lexington Railway Company, a railway corporation under the laws of the

State of Kentucky, party of the first part, and Joshua F. Speed as trustee, party of the second part.

Witnesseth: That whereas by authority of an act of the General Assembly of the Commonwealth of Kentucky, approved the 18th day of March, A. D. one thousand eight hundred and seventy-eight, the party of the first part has entered into a contract with the Northern Division of the Cumberland & Ohio Railroad Company for the lease, construction and operation of the latter company's line of road from Eminence, in Henry county, Kentucky, through a part of said county and the counties of Shelby, Spencer, and into Nelson county, as far as Bloomfield, all in the State of Kentucky, said lease to continue for thirty years upon the terms therein set out, in which it is stipulated by and on behalf of said first party herein that if the net earnings of said leased premises do not prove sufficient to pay the interest and to provide for the sinking fund of three hundred and fifty bonds of $1,000 each, bearing interest at the rate of seven per cent. per annum, payable half yearly, on the first days of June and December, and having twenty years to run from the 2nd day of July, A. D. one thousand eight hundred and seventy-nine, to be issued by said Northern Division of the Cumberland & Ohio Railroad Company; and if all other sources of raising money of said Northern Division of the C. & O. R. R. Co. fail to provide for said interest and sinking fund, then said first party herein should supply the deficiency so far as the same may be done by appropriating the net earnings, or so much thereof as may be needed, on its own lines which may accrue to it by reason of business coming to it from or over the said lines of the said Northern

Division of the C. & O. R. R. Co; and whereas said contract of lease has been fully consummated bv action of the stockholders of the first party herein, and it is now desired to carry into effect the said stipulations as to the said net earnings.

Now, in consideration of one dollar cash in hand paid by said second party to said first party and the premises, the said first party has this day and does hereby mortgage and put in lien all net earnings which may accrue to it by reason of business coming to it from or over said lines of the Northern Division of the C. & O. R. R. Co., to the said Joshua F. Speed, as trustee, aforesaid (who is the trustee in the mortgage made by said Northern Division of the C. & O. R. R. Co. to secure said three hundred and fifty bonds of $1,000 each) conditioned, that if the net earnings of the said leased premises do not prove sufficient to pay the interest and provide for the sinking fund of said mortgage bonds, then said first party, if all other sources of raising money of said Northern Division of the C. & O. R. R. Co. prove insufficient, will supply the deficiency, so far as it may be done, by appropriating and paying over promptly the net earnings, or so much thereof as may be needed on its own lines, which may accrue by reason of business coming to it from or over said Northern Division of the C. & O. R. R. Co.'s lines, for the purpose of discharging said interest and sinking fund as they severally fall due.

In testimony whereof, the said first party, acting under the authority and approval of its stockholders, duly assembled in stockholders' meeting on the 28th day of July, one thousand eight hundred and seventy-nine, has caused these

presents to be signed in duplicate in its corporate name by its president, and counter-signed by the secretary, and its corporate seal hereto affixed, this 28th day of July, A. D. eighteen hundred and seventy-nine.

It will further be seen that in order to better secure the holders of the bonds stipulated for in said lease that the L., C. & L. Ry. Co. executed a mortgage upon its net earnings derived from business coming to it from the lines of the said C. & O. R. R. Co.   It further appears that the trustees for the bondholders and the other contracting parties all united in the modified agreement, which together with said mortgage constitutes one entire contract and agreement.

Afterwards the appellee, Louisville & Nashville Railroad Company, purchased the entire property, rights and franchises of the L., C. & L. Ry. Co., including the lease from the C. & O. R. R. Co. of its line of railroad from Shelbyville to Bloomfield, and it is claimed that the said L. & N. R. R. Co. assumed and became bound to perform all the duties and incur all the obligations undertaken by the said L., C. & L. Ry. Co.   It appears that said L. & N. R. R. Co. took possession of said railroad from Shelbyville to Bloomfield and entered upon the execution of the contract aforesaid, and up to the filing of the petition herein had been operating said road from Shelbyville to Bloomfield, but had given notice of its intention to abandon the operation of said road, and thereupon the said C. & O. R. R. Co., and appellant, Schmidtz, trustee for the bondholders, instituted this action for the purpose aforesaid.

It will be further seen from the contract aforesaid, that the lessee was empowered to sell $250,000 of bonds of the

C. & O. R. R. Co. for the purpose of raising funds for building the road, and various other stipulations as to the operation of said road, including the net earnings thereof, were to be applied to the payment of the interest and principal of said bonds, and in the event that the earnings should not be sufficient that the net earnings on its own lines which may accrue to it by reason of business coming to it from or over the said lines of the said Northern Division of the C. & O. R. R. Co. should also be applied to the payment of the bonds aforesaid. It was also provided that the lessee should furnish various sums of money, which, if not repaid by the earnings of the C. & O. R. R. Co., should be a debt in favor of said lessee against the lessor, and it appears that the lessor, by reason of the failure of the road to meet the demands and expenses aforesaid, had become largely indebted to the lessee for which a personal judgment has been obtained against the lessor in behalf of the appellee, L. & N. R. R. herein, and the same returned "no property found."

It will be seen that by the terms of the lease the lessee was to operate said road from Shelbyville to Bloomfield for the term of thirty years.

It is alleged in the petition that great and irreparable damage will be sustained by appellant, if appellee should cease to operate the road in question, and it is made to appear that no adequate remedy, except a mandatory injunction can be obtained by appellant.

It is further claimed in the petition that the earnings on the L., C. & L. Ry. derived from business coming to it over the C. & O. R. R. have always been large, and there is now in the Louisville Law and Equity Court a suit, appealed

to this court, brought to enforce the claim of said trustee and said bondholders.

The answer of appellee admits that it purchased from the L., C. & L. Ry. Co. all its property rights, which that company had the right to convey or assign, except the franchise to exist as a corporation, and that the L., C. & L. Ry. Co. have undertaken to assign and transfer to the appellee the lease from the Northern Division of the Cumberland & Ohio Railroad Company referred to in the petition, but that said lease by its express terms provided that it shall not be assigned without the consent of the lessor, and the consent of the Northern Division of the C. & O. R. R. Co. was asked and refused by said company, and said company has never given its consent to the assignment of said lease. But the answer admits that the appellee took possession of said leased property, and has operated same ever since, but that it has done so as tenant at sufferance and not by virtue of the assignment of the lease.

It denies that it has made any net earnings on the line of the Northern Division of the C. & O. R. R., or appropriated same to its own use, or that there ever have been any net earnings, but alleges that the necessary cost of operation has exceeded the receipts in the sum of $199,411.70. It is admitted that the appellant instituted suit against the Northern Division of the C. & O. R. R. Co., and recovered judgment against it for $419,803.35, and that said company was justly indebted to appellee under the lease referred to, but which it failed and refused to pay. The answer also shows that the execution for said sum was returned no property found, and judgment was rendered for the sale of

(30)

the leased road subject to the prior mortgage of the bond-holders, but that no one would bid anything for the road subject to the lien of the bondholders, hence no sale was made.    It is also alleged that the court refused to give a judgment for sums which the appellee had lost in the neces-sary operation of said road, but confined its recovery to the amount that had been necessarily paid out by the L., C. & L. Ry. Co. in completing the construction of the road and paying interest on the mortgage bonds.    It is also de-nied that appellee completed the construction of the North-ern Division of the C. & O. R. R., but was so completed by the L., C. & L. Ry. Co. before the assignment of the lease to the appellee.    It also denies that appellant will suffer great or irreparable damages on account of appellee ceasing to operate the road on December 31st, 1895.    It is admitted that the charter of the C. & O. R. R. Co. enjoins upon it the duty to operate its road, and appellee is entirely willing that said Northern Division of the C. & O. R. R. Co. shall discharge the duty imposed upon it by its charter, but denies that any such duty is imposed upon this appellee under said lease, and insists that no duty rests upon the lessee, except such as grows out of the lease itself and is to the lessor.    It is also claimed that even if appellee was original-ly bound by the covenant of said lease, it would be harsh and inequitable to compel it to perform its onerous duties while said C. & O. R. R. Co. is continually in default in its covenant to repay to this appellee large sums of money.    It also charges that the C. & O. R. R. Co. is insolvent.

Appellee also denies that it owes any duty to the pub-lic or the bondholders represented by appellant to operate

said road.   That if it owes any duty at all, it is only to the
Northern Division of the C. & O. R. R. Co., and if it ever
owed any duty to said company under said lease it has been
absolved therefrom by the default of the lessor as aforesaid.
It is claimed that appellee owes no duty to the bondholders,
unless it is bound by the lease, and only so long as it is
bound under and by the terms of said lease to operate said
road.   That whatever duty the L., C. & L. Ry. Co. under-
took to perform to the bondholders was by reason of and
growing out of the contract of lease with the C. & O. R. R.
Co., and it only bound itself during the term of said lease
to account for the net earnings arising from the operation
of said leased line, and to use the same as provided in the
lease so far as it might be done towards the payment of
the interest and the aggregation of a sinking fund for the
retirement of said bonds, and it was only during the term of
the lease or that the lease should be in existence, and the
said appellee operated said road under the lease, that it
agreed to meet, so far as might be done from the profits on
its own line on business coming to it from or over the North-
ern Division of the C. & O. R. R., the interest on the bonds
aforesaid.   It is claimed by the terms of the lease that the
lessee was given the right to terminate the lease and the
duty  of the lessee thereunder and the rights of the lessor
thereunder by the sale of the franchise of the said C. &
O. R. R. Co., subject alone to the mortgage of $250,000 rest-
ing upon said property and franchise, and appellee having
a right to so terminate said lease, and the duties of said
lessee thereunder by sale, it also had the right of exhausting
all means to compel performance by the Northern Division

of the C. & O. R. R. Co. of its covenant to abandon said leased premises after eight years without sale. That appellee in good faith endeavored through means of court to sell the same, and after failing to sell same appellee claims it has a right to abandon the lease and all rights and duties thereunder, and submits to the court that under all the circumstances it would be inequitable at the instance of the Northern Division of the C. & O. R. R. Co., or the bondholders to compel it to continue the operation of said road at great loss to itself when it is not within the power of the court to compel the Northern Division of the C. & O. R. R. Co. to perform its material covenants under the lease. .

The defendant, the L., C. & L. Ry. Co., by its answer shows that on the first day of November, 1881, it by deed sold and conveyed to its co-defendant, the L. & N. R. R. Co., all its property, rights and franchises, except the franchise to exist as a corporation; that since that day it has had no property, money or credit and as a result is unable to operate the Northern Division of the C. & O. R. R., or do anything else which requires money or credit. It also has no power to comply with the order of this court, even if it should be made to operate said road.

The replies of appellant may be considered a traverse of the affirmative allegations of the answer, and the affirmative allegations of the replies are controverted of record.

A temporary injunction was granted by the Shelby Circuit Court, and upon motion to modify or dissolve the injunction thereto before Judge Hazelrigg of this court, the appellant was required to give an additional bond, and having failed to do so, the injunction was dissolved. Upon final

hearing the Circuit Court dismissed the petition, and Adolph Schmidt, individually, and as trustee for the bondholders of the Northern Division of the C. & O. R. R. Co., has appealed.

It is contended by the appellee that the contract as claimed is too indefinite to be specifically enforced by a Court of Equity, and even if the contract was more definite and certain, yet equity will not undertake to specifically enforce performance of a contract calling for continuous service requiring skill and judgment, and calling for continuous supervision upon the part of the court. It is also contended that the lessor in this case being in default and having failed to comply with its obligation that the contract should not be enforced. It is also contended that this contract should not be specifically enforced because of harsh results that would follow its enforcement. It is further claimed that the appellee, L. & N. R. R. Co., never became bound to operate the road in question for the term of thirty years.

It is contended for appellants, that appellee, L. & N. R. R. Co., became bound to perform the covenant of the L., C. & L. Ry Co. Secondly, the only way in which the rights of the bondholders under the contract can be protected is through the operation and maintenance of the L., C. & L. Ry. and the C. & O. R. R. Thirdly, this is a case of specific performance.

It seems to us that the appellee having purchased all the property and rights of the L., C. & L. Ry. Co., including the lease in question, and having taken charge of the road in question and operated the same for a long time, and having elected to sue and recover the sums due to the L., C. & L. Ry. Co. from the C. & O. R. R. Co., conclusively establishes

the fact that it assumed whatever obligations the L., C. & L. Ry. Co. were under, by virtue of the lease aforesaid, and it further seems clear that the appellee, L. & N. R. R. Co., operated the road under and by virtue of said lease and not as tenant by sufferance, and thus assumed all the obligations then resting upon the lessee. (Wiggan Ferry Co. v. Ohio & Mississippi Railway Co., 142 U. S., 408.)

The leases and mortgages hereinbefore referred to were for the benefit not only of the lessor and lessee, but also for the benefit of the bondholders of the lessor company, and this being true it follows that the trustee for the bondholders has a right to maintain an action for the enforcement of the contract for the benefit of the bondholders. It is true that the lessor has not paid sums of money falling due under the lease to the appellee, but it by no means follows that such failure authorizes the lessee to abandon the contract and cease to operate the road in question. It will be seen from the lease that certain acts or omissions to act should be held to terminate the lease, but the failure to pay the sums of money falling due from the lessor is not one of the conditions provided for as authorizing an abandonment of the lease. It is provided in the lease that for the sums of money becoming due to the lessee from the lessor that the lessee might sue and recover the same, and are given a lien subject to that of the bondholders upon the road in question, and it may be well argued this remedy being expressed in the lease that a forfeiture of the lease was not intended to be allowed either as a remedy or punishment for non-payment; moreover it was a statutory duty of lessor to operate the road, and the lessee having for a term of thirty years agreed that the

lessee should operate the same, it can not be released therefrom on account of the failure of lessor to pay its indebtedness to the lessee, unless same had been one of the stipulations named in the lease.

We are clearly of the opinion that the contract required the lessee to operate the road for the term specified. No other construction seems reasonable or tenable, and this view is sustained by the further fact that the lessee continued to operate the road for many years. But be this as it may, the bondholders having an interest in the contract in question and being in law a party thereto the failure of the lessor to pay the sums due from it to the lessee can not defeat the rights and interests acquired by the bondholders under and by virtue of the contract aforesaid.

It is earnestly insisted by appellee that the contract is not sufficiently certain to be specifically enforced. It seems, however, to us, that the terms of the lease are sufficiently certain and definite as to enable the court to compel specific performance. It would not be difficult for the court to safely and intelligently fix and determine the number of trains to be run upon the road and arrange the various details necessary for the operation of the road, and a fair construction of the lease would authorize such an operation of the road as the business interests of the community from time to time would require. (Robinson v. U. S., 13th Wallace, 165.)

It is further insisted by appellee that a court of equity will not enforce specific performance of a contract calling for continuous service involving skill and judgment and requiring continuous supervision on the part of the court.

Many authorities are cited in support of this contention, among which are the following:

Pomeroy's Equity, Vol. 3, section 1343, which reads as follows:

"Contracts for personal services or acts—Where a contract stipulates for special, unique, or extraordinary personal services or acts, or for such services or acts to be rendered or done by a party having special, unique, and extraordinary qualifications, as, for example, by an eminent actor, singer, artist, and the like, it is plain that the remedy at law of damages for its breach might be wholly inadequate, since no amount of money recovered by the plaintiff might enable him to obtain the same or the same kind of services or acts elsewhere, or by employing any other person. It is, however a familiar doctrine that a court of equity will not exercise its jurisdiction to grant the remedy of an affirmative specific performance, however inadequate may be the remedy of damages, whenever the contract is of such a nature that the decree for its specific performance can not be enforced and its obedience compelled by the ordinary processes of the court. A specific performance in such cases is said to be impossible; and contracts stipulating for personal acts have been regarded as the most familiar illustrations of this doctrine, since the court can not in any direct manner compel an actor to act, a singer to sing, or an artist to paint. Applying the same course of reasoning, the English courts formerly held that they could not negatively enforce the specific performance of such contracts by means of an injunction restraining their violation. Those courts have, however, entirely receded from this latter conclusion.

The rule is now firmly established in England, that the violation of such contracts may be restrained by injunction, whenever the legal remedy of damages would be inadequate, and the contract is of such a nature that its negative specific enforcement is possible. This rule was first applied to stipulations which were in form expressly negative, but was soon extended to affirmative contracts which implied or involved negative stipulations."

It will be seen from the foregoing that the contract here sought to be enforced is essentially different from the illustrations or cases cited in the section quoted.

Marble Co. v. Ripley, 10th Wallace, 358, is cited: It will be seen from the opinion in that case that the contract was to deliver a quantity of marble of certain kinds and in blocks of a kind, and the court there held that specific performance ought not to be granted on account of the great difficulty of enforcing same, and further that one party had the right at any time to terminate the contract on one year's notice.

The case of Texas Railway Company v. Marshall, 136th U. S., 406 is relied on by appellee. It appears from that case that the city of Marshall agreed to give to the Texas Railway Company $300,000 in bonds and 66 acres of land for shops, etc., and the company in consideration of the donation agreed to permanently establish its eastern terminus and offices at Marshall, and to establish and construct its machine shops, car works, etc., in said city. The city performed its agreement, and the company made Marshall its eastern terminus and built a depot, etc., there. After the expiration of a few years Marshall ceased to be the terminus

of the road and some of the shops were removed. The city filed its bill in equity to enforce the agreement, both as to the terminus and as to the shops. The court held that establishing the shops, etc., and keeping them there for eight years, and until the interest of the company and the public demanded the removal of some or all of them to some other place, satisfied the contract. It is true that the court also stated in substance that the various duties and acts to be performed were such as a court of equity would not undertake to specifically enforce, if the contract had required perpetual performance.

It may be conceded that some of the authorities cited by appellee sustain its contention, but we deem it unnecsary to notice any further in detail.

It is also insisted by appellee that the enforcement of the contract under consideration would result in great hardship, and equity will not enforce specific performance of a contract that will result in great hardship.

We do not think the facts in this case bring it within the rule announced in any of the decisions cited. It is manifest that the loss to appellee by reason of expense incurred in building the road, and for which it has obtained judgment against the C. & O. R. R. Co. will remain unaffected by operation of the leased line. A court of equity might refuse to enforce a contract that at the time of its execution involved hardship or was unconscionable, but the mere fact that one having a number of years to run might turn out a losing investment or contract affords no reason of refusal to specifically enforce it; moreover, if we are to regard the judgment referred to in the pleadings in the case of

Schmidt, Trustee, v. L. & N. R. R. Co., 95th Kentucky, 289, the operation of the leased line has by no means been a total loss to the appellee.

It seems clear to us that there is no adequate relief for the bondholders to be had except by specific enforcement of the contract; hence the important question to be considered, is the power of the court to enforce specifically the contract, and whether the same in equity should be enforced. As before said, there is some authority cited which sustains the contention of appellee, that courts of equity can not or ought not to specifically enforce a contract requiring skill and long or continuous supervision of the court, but it is insisted by appellants that the weight of recent decisions sustains its contention that such contracts can and ought to be enforced, and they cite several decisions in support of this contention, among which is the case of Prospect Park and Coney Island Railroad Company v. The Coney Island and Brooklyn Railroad Company, 144 N. Y., 152. It appears that the plaintiff granted to the defendant use of certain of its tracks in the city from a point named to said depot for 21 years from June 1st, 1882, free of charge, and defendant covenanted to run cars to plaintiff's depot to connect with trains run to and from the island. The contract contained the provision that in case defendant should use steam as a motive power on its line between the city and the island either party could terminate the contract on six months' notice. The parties acted under the contract until October, 1889, when defendant adopted the trolley system of running cars by electricity for use upon its road between the city and the island, ceased to run its cars to said depot, and ad-

vised plaintiff that it did not intend to do so. The plaintiff instituted suit to compel specific performance of the contract. In the opinion the court said:

As a final point the learned counsel for the defendant insists that equity will not enforce the specific performance of a contract having some years to run which requires the exercise of skill and judgment and a continuous series of acts.

While there is some conflict in the cases, and all are not to be reconciled, yet the great weight of authority permits specific performance in the case at bar.

The special term enjoined the defendant from operating any of its cars unless it performs its contract with the plaintiff.

The provisions of this contract are neither complicated nor difficult and are such as a court of equity can enforce in its discretion.

A few of the cases may be referred to as illustrating the power vested in a court of equity to compel the specific performance of contracts similar to the one at bar.

In Storer v. Great Western Railway Co. (2 Young & Coll. N. R. 48) the court compelled the defendant to construct and forever maintain an archway and its approaches. The court said there was no difficulty in enforcing such a decree. In Wilson v. Furness Ry. Co. (Law Rep. 9 Equity Cases, 28) the defendant was compelled to erect and maintain a wharf, (See also Green v. West Cheshire R. Co.. Law Rep., 13 Equity Cases, 44.

In Wolverhampton & W. R. Co. v. London & N. W. R. Co., (Law Rep. 16 Eq. Cas. 433) the agreement between the

two companies was that the defendant should work the plaintiff's line, and during the continuance of the agreement develop and accommodate the local and through trade thereof and carry over it certain specific traffic.

The bill was filed to restrain the defendant from carrying a portion of the traffic which ought to have passed over the plaintiff's line by other lines of the defendant.

A point was made that the court could not undertake to enforce specific performance, because it would require a series of orders and a general superintendence to enforce the performance, which could not conveniently be administered by a court of justice. The injunction issued and Lord Selborn said (p.438): 'With regard to the argument that upon the principles applicable to specific performance no relief can be granted, I can not help observing that there is some fallacy and ambiguity in the way in which in cases of this character those words 'specific performance' are used. * * * * The common expression as applied to suits known by that name, presupposes an executory as distinct from an executed agreement * * * * Confusion has sometimes arisen from transferring considerations applicable to suits for specific performance, properly so called, to questions as to the propriety of the court requiring something or other to be done in specie. * * * Ordinary agreements for work and labor to be performed, hiring and service and things of that sort, out of which most of the cases have arisen, are not, in the proper sense of the word, cases for 'specific performance;' in other words, the nature of the contract is not one which requires the performance of some definite act, such as the court is in the habit of requiring

to be performed by way of administering superior justice, rather than to leave the parties to their remedies at law. * * * The question is whether the defendants, being in possession, they are not at liberty to depart from the terms on which it was stipulated that they should have that possession.'

The American cases are equally clear.

In Lawrence v. Saratoga Lake Ry. Co. (36 Hun., 467) the defendant was among other things, to erect a depot at which all trains were to stop. Specific performance was decreed, the court holding that, although under the agreement the defendant could not be compelled to run trains upon its road, yet it might properly be enjoined from running any regular trains which did not stop at the station.

The objection that the judgment in this case involves continuous acts and constant supervision of the court is well met by the reasoning in Central Trust Co. v. Wabash, St. Louis & P. (29 Fed. Rep., 546) being affirmed as Joy v. St. Louis (138 U. S. 1, 47, 50), where Judge Blatchford wrote the opinion.

As to inconvenience or circumstances which affect the interest of one party alone constituting a reason why performance should not be decreed, the case of Marble Co. v. Ripley (10 Wall. 339, 358) furnishes a clear discussion of the general principles involved.

The rule established by the above and kindred cases is that a contract is to be adjudged as of the time at which it was entered into, and if fair when made the fact that it has become a hard one by the force of subsequent circumstances or changing events will not necessarily prevent its specific

performance.    (See also Stuart v. London & N. W. Ry. Co.,
15 Beavan, 519; Mortimer v. Capper, 1 Bro. C. C. 156; Jack-
son v. Lever, 3 Id. 605; Paine v. Meller, 6 Ves. 349; Paine
v. Hutchison, L. R., 3 Eq. Cas. 257;    Franklin Tel. Co. v.
Harrison, 145 U. S. 459, 472, 473.)

A large number of other cases might be cited sustaining
the power of the court to decree the specific performance
of this contract, but we do not deem it necessary.

There can be no well-founded doubt as to the power of
the court in the premises, and the important question is
whether in the exercise of a wise discretion and in view of
all the circumstances specific performance should be de-
creed.

After a most careful consideration of this case we have
reached the conclusion that the plaintiff is entitled to have
the contract specifically performed.

The order of the general term is reversed and the judg-
ment of the special term is affirmed, with costs in all
the courts."

The case of Joy v. St. Louis, 138 U. S., page 1, seems also
to sustain the contention of appellant.   Union Pacific Ry.
Co. v. Chicago & Rock Island Ry. Co.; and Union Pacific
Ry. Co. v. Chicago, Milwaukee & St. Paul Ry. Co., 163 U.
S. Reports, 564 (decided May 25, 1896), were cases seeking
specific enforcement of a contract for the use of certain rail-
road trackage rights. It was urged in that case that courts of
equity would not undertake to enforce specific performance
of a contract requiring skill and having a long time to run.
The court in discussing that question said:

"3. The jurisdiction of courts of equity to decree the spe-

cific performance of agreements is of a very ancient date, and rests on the ground of the inadequacy and incompleteness of the remedy at law. Its exercise prevents the intoler-able travesty of justice involved in permitting parties to refuse performance of their contracts at pleasure by electing to pay damages for the breach.

It is not contended that multiplicity of suits to recover damages for the refusal of defendants to perform would afford adequate relief, nor could it be, for such a remedy under the circumstances would neither be plain nor complete, nor a sufficient substitute for the remedy in equity, nor would the interests of the public be subserved thereby. But it is objected that equity will not decree specific performance of a contract requiring continuous acts involving skill, judgment and technical knowledge, nor enforce agreements to arbitrate, and that this case occupies that attitude. We do not think so. The decree is complete in itself, is self-operating and self-executing, and the provision for referees in certain contingencies is a mere matter of detail and not of the essence of the contract.

It must not be forgotten that in the increasing complexities of modern business relations equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies "so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated;" and "has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of

every case, and to satisfy the needs of a progressive social condition in which new primary rights and duties are constantly arising and new kinds of wrongs are constantly committed." Pom. Eq., sec 111.

We regard the case of Joy v. St. Louis, 138, U. S. 1, as determining that this contract was one within the control of a court of equity to specifically enforce. In that case the St. Louis, Kansas City & Colorado Railroad Company acquired by succession, under a contract, the right of running its trains over the line of the Wabash Company from a point on the Northern line of Forest Park, through the park and into the Union Depot at St. Louis, together with the right to use side tracks, switches, turnouts and other terminal facilities. It was a continuing right and unlimited in time, and the contract contained provisions regulating the running of trains and prescribing the duties of superintendents, trainmasters and other officers. The objections that are urged against the specific performance of the contract under consideration were urged against the specific performance of that contract and were severally overruled, and it was held that nothing short of the interposition of a court of equity would provide for the exigencies of the situation.

This case was cited with approval in Franklin Telegraph Co. v. Harrison, 145 U. S., 459. The contract there was one for the use by Harrison Bros. & Co. of a wire of the Franklin Telegraph Company between Philadelphia and New York. It appeared that Harrison Brothers & Co. had been in the possession of a certain valuable contract with the Insulated Lines Telegraph Company, to the rights of which company

(31)

the Franklin Telegraph Company had succeeded. Desiring to have that contract terminated, the Franklin Company entered into a new contract with Harrison Brothers, by which the Franklin Company agreed to allow Harrison Brothers the right to put up, maintain and use a telegraph wire on the poles of the Franklin Company. At the expiration of ten years thereafter the wires were to become the property of the telegraph company, after which time the telegraph company was to lease the same to Harrison Brothers for $600 per annum, payable quarterly, and with all the other terms and conditions as they existed before. The ten years having expired Harrison Brothers continued to use the wire, paying the stipulated sum of $600 per annum therefor, but after this had gone on for about three years the telegraph company served notice on Harrison Brothers putting an end to the agreement, whereupon Harrison Brothers filed a bill to restrain the telegraph company from terminating the contract and to have the same specifically enforced, and the court held the contract was one proper for specific performance.

The same was laid down in Prospect Park & Coney Island Railroad v. Coney Island & Brooklyn Co., 144 N. Y., 152, where many authorities are cited.

In Railroad Company v. Alling, 99 U. S., 463, the court directed an injunction against the Canon City Railway Company from preventing the Denver road from using the right of way through the Grand Canon, and said: "If, in any portion of the Grand Canon, it is impracticable or impossible to lay down more than one road bed and track, the court, while recognizing the prior right of the Denver Company to con-

struct and operate that track for its own business, should by proper orders, and upon such terms as may be just and equitable, establish and secure the right of the Canon City Company, conferred by the act of March 3, 1875, to use the same road-bed and track, after completion, in common with the Denver Company."

In the Express Cases, 117 U. S. 1, the express companies sought to restrain the railway companies from refusing to carry express matter on the terms of contracts which had expired, which the court held could not be done, and it was said: "The Legislature may impose a duty, and when imposed it will, if necessary, be enforced by the courts; but, unless a duty has been created either by usage or by contract, or by statute, courts can not be called on to give it effect." It was objected in Joy's case that the court was proposing to assume the management of the railroad "to the end of time," but Mr. Justice Blatchford, speaking for the court, responded that the decree was complete in itself, and that it was "not unusual for a court of equity to take supplemental proceedings to carry out its decree and make it effective under altered circumstances." And the court applied the principle that considerations of the interests of the public must be given due weight by a court of equity, when a public means of transportation, such as a railroad, comes under its jurisdiction. "Railroads are common carriers and owe duties to the public," said Mr. Justice Blatchford. "The rights of the public in respect to these great highways of communication should be fostered by the courts; and it is one of the most useful functions of a court of equity that its methods of procedure are capable of being

made such as to accommodate themselves to the development of the interests of the public, in the progress of trade and traffic, by new methods of intercourse and transportation. The present case is a striking illustration. Here is a great public park, one of the lungs of an important city, which, in order to maintain its usefulness as a park, must be as free as possible from being serrated by railroads; and yet the interests of the public demand that it shall be crossed by a railroad. But the evil consequences of such crossing are to be reduced to a minimum by having a single right of way, and a single set of tracks, to be used by all the railroads which desire to cross the park. These two antagonisms must be reconciled, and that can be done only by the interposition of a court of equity, which thus will be exercising one of its most beneficent functions."

Clearly the public interests involved in the contracts before us demand that they should be upheld and enforced. It seems to us that the weight of modern authorities sustain the contention of appellant, and a court of equity can enforce specific performance of the contract under consideration. It is pretty well known history of the country that many railroads and for long terms have been operated under the direct supervision and control of courts of equity. It does not seem to us that it would be difficult to enforce specific execution of the contract under consideration. The court might enforce its orders by attachment or rule according to equity practice, or, if deemed best, it might place the road in the hands of a receiver to be operated at the cost and expense of the appellee, the Louisville & Nashville Railroad Company.

For the reasons indicated the judgment of the court below is reversed and the case remanded with directions to enter judgment requiring the appellee, the Louisville & Nashville Railroad Company, to operate the leased line until the expiration of the thirty year lease aforesaid, and for proceedings consistent with this opinion.

Judges DuRelle and Burnam, dissenting.