HOUSTON & T. C. R. CO. et al. v. CITY OF ENNIS et al. (No. 7733.)

(Court of Civil Appeals of Texas. Dallas. Feb. 2, 1918. Rehearing Denied March 2, 1918.)

1. RAILROADS ⏂46 — CONSTRUCTION — PERPETUAL CONTRACTS.

Where a receiver contracting on behalf of a railroad company for a valuable consideration agreed to establish headquarters for a division at a particular town and to maintain adequate buildings, machine shops, and roundhouses, and to supply the same with necessary machinery, and the contract was observed by the receiver and the succeeding railway company for over 20 years, it must be construed as a perpetual contract which the company cannot terminate except on proof by clear and satisfactory evidence that it could not with reasonable effort while complying with the contract perform the duties owing to the public.

2. RAILROADS ⏂46 — CONTRACTS TO ESTABLISH DIVISION HEADQUARTERS—VALIDITY.

In view of Rev. St. 1911, art. 6423, declaring that every railroad company chartered by the state or owning or operating any line shall keep and maintain its general offices within the state of Texas at the place named in its charter for the locating of its general offices, and, if no certain place is named, then the company shall keep and maintain its general offices at such place within the state where it shall have contracted or agreed or shall hereafter contract or agree to locate its general offices for a valuable consideration, and that such railroad shall keep and maintain its machine shops and roundhouses or either at such place or places as it may have agreed to keep them for a valuable consideration received, a contract entered into by receiver of a railroad company to establish division headquarters with necessary roundhouses and machine shops at a particular town based on a valuable consideration and which was adopted by the succeeding railroad company is valid and enforceable.

3. RAILROADS ⏂57—DECREE—CONSTRUCTION —PROVISIONS.

Where a railroad company attempted without excuse to terminate a contract previously entered into by a receiver of the property to establish for a valuable consideration division headquarters at a particular town, a decree enjoining the company from removing from the town the division terminus for all its trains operating into, through, or out of the city, and also locomotives, cars, equipment, trainmen, conductors, brakemen, crews, and other employés which are to be used and such officials as are necessary in such division terminus or on trains, traffic of an extraordinary or unusual nature being excepted, is not erroneous as undertaking to fix the character of the company's train schedules or system of running or changing crews or engines, or the length of train runs, but undertakes substantially only to preserve the division terminus operations provided for in the contract.

4. RAILROADS ⏂57—DECREE—CONSTRUCTION —UNCERTAINTY.

Such decree is not erroneous as being indefinite or uncertain, for the railroad company might conform to it substantially by proper effort.

5. RAILROADS ⏂57—CONTRACTS—DECREE.

Where the evidence showed that division headquarters are where the superintendent's office, roundhouse, and division terminal are, and that it includes the train dispatcher's office, the decree enjoining the railroad company from ceasing to keep or maintain and from

---

⏂For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

removing or causing to be removed from the city the superintendent and assistant superintendent and dispatchers with their office forces was not erroneous, but properly prevented the company from removing officials whose presence was incidental to the maintenance of division headquarters.

6. RAILROADS ⬤⬤46 — CONTRACTS—ENFORCEMENT.

A contract by a railroad company to maintain its division headquarters at a particular town entered into by a receiver of the property for a valuable consideration and complied with for many years may be specifically enforced by injunction.

7. RECEIVERS ⬤⬤142—CONTRACTS—LIABILITY OF PURCHASER.

Where after sale of railroad property by a receiver the purchaser delayed taking possession of the property leaving the receiver in possession, and the court in passing on a motion to delay delivery ordered that the property should be delivered and received by the purchaser or his assigns subject to and charged with the obligations and liabilities contractual or resulting from torts or otherwise incurred by the receiver, the receiver became the purchaser's agent, and the railroad property was charged with his contracts, and a corporation subsequently organized to operate it was bound by a contract of the receiver to establish division headquarters at a particular town for a valuable consideration.

8. COURTS ⬤⬤489(10)—CONTRACTS—JURISDICTION OF COURT.

While a receiver appointed by the federal court had possession of railroad property and before a purchaser took possession, he contracted for a valuable consideration to establish division headquarters at a particular town. Orders on application by the purchaser to delay taking possession of the property charged him with liability for the acts of the receiver, contractual or otherwise. The receivership was finally terminated by a complete settlement and order discharging the receivership. The railroad company organized by the purchaser to operate the property for many years complied with the contract made by the receiver. *Held*, that the federal court which appointed the receiver did not have exclusive jurisdiction over a suit to enjoin the railroad company from removing division headquarters from the town in violation of the contract, for the receiver had long been discharged, and the controversy was not one germane to the case in which the receiver was appointed; this being particularly true in view of the fact that the federal court itself denied the railroad company's supplementary bill praying for an injunction to restrain maintenance in the state court of an action to enjoin the company from removing headquarters from the town.

9. RECEIVERS ⬤⬤142—FEDERAL COURTS—JURISDICTION.

Under Acts 20th Leg. c. 24, providing for organization of railroad companies acquiring railroad property on receiver's sale, and declaring that no company availing itself of any such privilege shall claim to be under the jurisdiction of the federal courts by reason of its purchase, a railroad company organized to operate railroad property purchased on sale by receiver appointed in the federal court cannot, having accepted a charter pursuant to such limitations, assert the jurisdiction of the federal court to determine the validity of a contract entered into by the receiver.

10. PLEADING ⬤⬤110—OBJECTIONS TO JURISDICTION—WAIVER.

Under Rev. St. 1911, arts. 1902, 1909, 1910, respectively declaring that the answer may include several pleas whether of law or fact, that pleas shall be filed in due order, and that pleas to the jurisdiction shall be determined during the term at which they are filed if the business of the court permit, and in view of rule 7 for district and county courts (142 S. W. xvii), a defendant waived its exclusive privilege to be sued in the federal court, where no bill of exception preserving the overruling of such plea was reserved, and the final judgment to which exceptions were reserved purported to overrule the plea.

11. VENUE ⬤⬤22(1)—JURISDICTION—INJUNCTION.

Rev. St. 1911, art. 1830, declares that no person who is an inhabitant of the state shall be sued out of the county in which he has his domicile. Section 4653 declares that a writ of injunction other than one to restrain proceedings in another suit, etc., shall, if the party against whom it is granted be an inhabitant of the state, be returned to and tried in the district or county court of the county in which such party has his domicile. A suit for injunction to enforce compliance by a railroad company with a contract to establish and maintain division headquarters at a particular town, in which the company and an individual who was a proper party were joined as defendants, was instituted in the county of the individual defendant's domicile instead of that of the company. *Held* that, as the injunction was an ancillary proceeding, the venue was correctly laid, and the company was not entitled to assert a privilege to be sued in the county of its residence.

Appeal from District Court, Ellis County; F. L. Hawkins, Judge.

Suit by the City of Ennis and others against the Houston & Texas Central Railroad Company and others. From a decree for plaintiffs, defendants appeal. Affirmed.

J. L. Gammon, of Waxahachie, and J. T Garrison and Baker, Botts, Parker & Garwood, all of Houston, for appellants. Farrar & McRae, of Waxahachie, and Thompson, Knight, Baker & Harris, of Dallas, for appellees.

RAINEY, C. J. This was a suit by the city of Ennis and certain individuals, who, as a committee of citizens of Ennis, brought against the Houston & Texas Central Railroad Company and certain of its officers to prevent the moving of its division superintendent's offices, train dispatchers, machine shops, and roundhouse from Ennis to Mexia, and to enforce the observance of a certain contract made by Charles Dillingham on December 6, 1890, then receiver of the Houston & Texas Central Railroad Company. The plaintiffs' petition alleged proper allegations to declare said contract valid and to enforce its validity. A temporary injunction was granted, from which there was no appeal.

The defendants answered by the general issue and specially that circumstances had arisen which rendered it advisable and proper for it to remove its "division headquarters" from Ennis to Mexia, another point on its main line, etc. A trial was had on its merits. All the defendants except the railroad company and Costello were dismissed from the case, and the case was submitted to a jury, on which answers were returned and

judgment was rendered in favor of plaintiffs decreeing said contract to be valid and enforceable and to be performed and a writ of injunction be perpetuated, from which judgment the railroad company and Costello perfected an appeal.

### Conclusions of Fact.

We adopt and take from the brief of counsel of appellees as part of our conclusions of fact and as throwing light thereon the following:

"In 1888 the old Houston & Texas Central Railway Company was in the hands of Charles Dillingham, as receiver. He had been appointed in a suit in equity in the federal court at Galveston. In that suit a decree of foreclosure had been entered, and Dillingham, as master commissioner, had sold the railway property to one F. P. Olcott, president of Central Trust Company, of New York. The sale had been reported and confirmed, and the execution of deed and the delivery of deed and property to the purchaser had been ordered, but for reasons of his own Mr. Olcott had not taken physical possession of the railway properties, although the receiver and the federal court were anxious that he should take over the property in order that the receivership might be terminated.

"For purposes of operation the railway theretofore had been split into three general divisions. The middle division covered that portion of the system between the cities of Hearne and Corsicana. The northern division covered that portion of the system north of Corsicana. It had been determined that the divisional arrangement was unsatisfactory, and as the selection of Corsicana for division terminus had been tentative, and the physical properties owned by the railway company at that point of but nominal value, the managers determined to create a new division point at Garrett, just above the city of Ennis, and extend the middle division so that its territory would cover between Hearne and Garrett. Inasmuch as the northern division was under the administration of the division superintendent in charge of the middle division, the proposed plan of moving the northern terminus of the middle division to a point further north than Corsicana would have, in addition to its other advantages, the effect of bringing the divisional administration closer to the problems on the northern division.

"The citizens of Ennis, learning of the plans of the railroad company, and realizing that to locate a division point a few miles away from Ennis would be harmful to them, got into touch with officials of the railroad, and, after protracted negotiations, reached an agreement with the railroad people, in substance, to the effect that the division headquarters, with its division superintendents, division dispatchers, shops, roundhouses, etc., would be located and maintained in and near the city of Ennis if the city would furnish tract of land pointed out by the railroad people, perpetual water rights in the city's water reservoirs, and a bonus of $25,000 in money.

"The negotiations, though begun in 1889, consumed quite a period of time, and did not eventuate in a contract until December 6, 1890, at which time the city and citizens of Ennis conveyed to Mr. Dillingham, acting for the railroad company, the lands agreed on, the perpetual water rights agreed on, and gave him a note, executed by responsible makers, for the agreed bonus of $25,000, and the railroad people, acting through Mr. Dillingham, made contract, in consideration of the foregoing, to locate and maintain in and near Ennis all of the railway establishments above referred to.

"The bonus note was shortly thereafter paid in full, and the railroad shortly thereafter moved to Ennis, and ever since has maintained there the various departments contemplated in the negotiations and contract mentioned.

"During the entire time consumed by the negotiations mentioned, for months prior thereto, and for over two years thereafter, Dillingham remained in nominal custody of the railway property, Mr. Olcott not coming forward and taking possession, as the various orders of the court contemplated that he would do, but for reasons of his own leaving the property in Mr. Dillingham's custody. Under the decisions, and especially under the decision in the case of Dillingham, Receiver, v. Bath, 44 S. W. 595, decided in the Court of Civil Appeals at Dallas, the possession by Dillingham under such circumstances was, in legal effect, in the capacity of agent of the railroad company, rather than technically as receiver, and the railroad company was responsible for his contracts upon the ordinary principles of agency.

"In 1893 Mr. Olcott and the present railroad company, which meantime he had organized and to which he had conveyed the railway property, became ready to take over actual operation of the railway lines and did so. By various acts it adopted and ratified the contract with the people of Ennis, and for more than 20 years it continued to maintain in and near Ennis all of the railway departments agreed upon in the location and maintenance contract.

"In 1912 Mr. Scott became president of the railroad company, and brought into its service some other new officials, and in 1913 a scheme was evolved for again moving the division headquarters, this time to the south, indeed to a point south of its original location, viz. to Mexia, in Limestone county, Tex. To that end land was acquired of more than 250 acres in area, 170 of which was intended to carry an immense water reservoir adequate for all the railroad's requirements, the other 80-odd acres to be used for yards, divisional buildings, roundhouses, and, as we contend, railway shops. The building of the yards was begun, a roundhouse was built, divisional headquarters building was started, and orders were given for the division superintendent and his entire staff, including division dispatchers, to move from Ennis to Mexia. Incidentally further expenditures in keeping up equipment, etc., in the Ennis shops was discontinued in 1913.

"As soon as the people of Ennis learned of the plans of the railroad, efforts were made to induce the railroad company to change its plans and not to leave Ennis prostrate by carrying out the removal scheme. Conferences were had with the division superintendent at Ennis, who was found to be quite obdurate. Indeed, it was learned that he was personally highly gratified over the removal plans, and that he had been actively advocating the removal, largely on account of personal ill will on his part toward certain Ennis officials, growing out of a controversy over the escape of some prisoners which the railroad company had caused to be arrested and confined in the city jail at Ennis.

"Getting no relief in this quarter, a committee of Ennis citizens next visited Mr. Scott, the president of the railroad company, and endeavored to dissuade him from carrying out the removal plans. This visit likewise was without result. Mr. Scott emphatically informed the committee that the railroad company had decided to and intended immediately to move its division superintendent and his assistants, its division dispatchers, and the clerical part of division headquarters, and had acquired land and commenced improvements, etc., to take care of the removed departments. He was pressed to disclose his plans with reference to shops and roundhouses, but could be prevailed on to make no declaration other than at present he had no plans for removing or abandoning the Ennis shops and roundhouses.

"The result of the conference of the committee with Mr. Scott was naturally disquieting to the committee and to the people of Ennis. They had other warnings, more or less direct, to the effect that the railroad company planned eventually the complete abandonment of Ennis, so far as the departments covered by the old contract were concerned. They were informed about the progress of work on the improvements at Mexia. They learned of the construction of the new roundhouse at Mexia, and that it was built according to a plan which made it capable of enlargement in capacity to a point twice that of the roundhouse at Ennis. In the light of all these evidences of a fixed purpose on the part of the railroad company to ignore the contract this suit was brought."

When the contract for locating the division headquarters of the Houston & Texas Central Railway Company was made on December 6, 1890, Charles Dillingham was receiver, regularly appointed by the United States Circuit Court for the Eastern District of Texas, and so remained in charge of the railroad company until 1893, when he was duly discharged by said court. The contract made by him with said city of Ennis and its citizens is as follows:

"The State of Texas.

"Whereas, on the 10th day of March, 1890, in the suit of Nelson S. Easton and others against the Houston & Texas Central Railway Company and others, No. 198 equity, pending in the United States Circuit Court for the Eastern District of Texas, Hon. Don A. Pardee, judge of said Circuit Court, made and entered of record an order authorizing, empowering, and directing Charles Dillingham, receiver, heretofore appointed in said cause, to erect the necessary buildings for a roundhouse and machine shops, and supply the same with necessary and sufficient machinery necessary for division headquarters at some point between the towns of Garrett and Ennis, on its line of railway, and further to establish at said point the headquarters of the middle division of said railway, on a tract of land which had been tendered by the citizens of Ennis for the location of said machine shops, roundhouse, and headquarters, provided there should be tendered to said Charles Dillingham, as receiver, sufficient and satisfactory conveyances of at least eighty (80) acres of land, and that there should be also made a good and sufficient guarantee for the payment to him, the said Charles Dillingham, receiver, of the sum of twenty-five thousand ($25,000.00) dollars, and there should be also made a contract for the free supply of water for the use of said railway; and

"Whereas, there has been conveyed to the said Charles Dillingham, on the part of certain citizens of Ennis, the following described tracts of land situated in the county of Ellis and state of Texas, viz.: One tract containing seventy-eight and four-tenths (78.4) acres, being a part of the I. D. Shepherd survey, said tract fronting on the right of way of the Houston and Texas Central Railway 3,125 feet, and extending back 1,083 feet, and also lots Nos. two (2), three (3), and four (4) of block No. nine (9), according to the maps of the city of Ennis made by Theodore Kosse, and also the perpetual free use of the water privileges of the reservoir of the city of Ennis, all of which will more fully appear by reference to the deed of A. H. Dunkerly to me of even date herewith. And there has also been executed and delivered to the said Charles Dillingham a joint and several promissory note of J. Baldridge, D. F. Singleton, P. Freeman, L. Cerf, T. D. Turner, Mark Latimer, J. C. Loggins and J. Blakey for twenty-five thousand ($25,000.00) dollars, pay-

able to their own order, and by them indorsed:

"Now, in consideration of the said premises, the said Charles Dillingham, as receiver of the Houston & Texas Central Railway, agrees, as such receiver, to establish headquarters of the middle division of the Houston and Texas Central Railway at the town of Ennis, in Ellis county, Tex., and to erect, construct, and maintain on said tract of land hereinbefore mentioned adequate buildings and machine shops and roundhouses, and supply the same with necessary machinery, sufficient for the maintenance of such machine shops as may be necessary and be required for the proper operation of the same, said roundhouse to contain at least 12 stalls for locomotives, and such machinery to be placed in said machine shops as may be requisite and necessary for the operation of said division machine shops; it being understood that the said Dillingham is not required to expend for the construction of said roundhouse, machine shops and machinery a sum exceeding twenty-five thousand ($25,000) dollars.

"It is further understood that the machine shop and roundhouse herein contracted to be constructed shall be built on that part of block No. nine (9) hereinbefore mentioned as having been conveyed to the said Charles Dillingham, receiver, or on that part of the I. D. Shepherd survey not more than eight hundred (800) feet north of the south line of said Shepherd survey, and that all other improvements erected on such portion of said Shepherd survey more than (800) feet from the south line thereof shall be ditched and drained in such way and manner so that the water shall not flow in or in the direction of said city reservoir.

"It is further understood that the machine shops and roundhouse shall be completed on or before January 1, 1892. It is further understood that the office of the division superintendent and the headquarters of the middle division of said railway shall be removed, as hereinbefore stipulated, on or before the 1st day of March, 1891. It is further understood that nothing herein contained is to prevent the division superintendent and other officers and employés of the said railway company from having their business office within the limits of the city of Ennis.

"Witness my hand this 6th day of December, 1890.　　　　[Signed]　Chas. Dillingham,
"Receiver, Houston & Texas Central Ry."

The contract was not signed by the city of Ennis, nor by any of its officers or citizens, but was accepted by the railway company, and at once acted upon, and its terms complied with both by the railway company and the city of Ennis, and has been so done ever since until interrupted by this suit.

[1, 2] The first assignment of error and proposition presented by appellant are:

"The court erred in not entering a judgment in favor of the defendant, because the undisputed evidence shows that the only contract which the plaintiffs have to rely on in this suit is the written contract signed by Chas. Dillingham, receiver of the Houston & Texas Central Railway Company, dated December 6, 1890, a copy of which is attached as Exhibit B to the third amended original petition, and the undisputed evidence further shows that this contract did not bind the receiver to keep the facilities referred to in it at Ennis for any length of time, that the receiver was not authorized to contract to keep them there, and the undisputed evidence shows that this contract was fully discharged by the receiver, and that there is no obligation on the part of this defendant growing out of said contract to keep said facilities at Ennis."

Proposition: "By the contract of December 6, 1890, the receiver agreed to move the headquarters and the machine shops and roundhouse

of the middle division of the Houston & Texas Central Railway Company from Corsicana, and establish them at Ennis, but did not agree to keep them there forever or never to remove them, and the establishment of them at Ennis by the receiver, and the keeping of them there by him first, and then by appellant, for more than 23 years, constituted full compliance with the contract, and the company was not obligated to keep them there longer."

In the contract for moving the division headquarters from Corsicana to Ennis there was no specified time mentioned for them to remain, nor did the parties stipulate specifically that it should remain forever, but said contract must be construed in conformity with the law of the land. In construing the contract under consideration the circumstances under which it was made and the purpose and object thereof are not inconsistent with the plain import of the language used. There is no ambiguity in the language used in the contract. It for a valuable consideration agreed—

"to establish headquarters of the middle division of the Houston & Texas Central Railway Company at the town of Ennis, in Ellis county, Tex., and to erect, construct, and maintain * * * adequate buildings and machine shops and roundhouses and supply the same with necessary machinery sufficient for the maintenance of such machine shops as may be necessary and be required for the proper operation of the same."

The language imports a continuous contract, and, having been observed by the receiver and the railway company for over 20 years, it cannot now be terminated by the said company without some legal excuse for so doing; that is, it must show by clear and satisfactory evidence that it could not perform the duties owing to the public consistent with proper discharge by their reasonable effort. The railroad company undertook to show such a condition existed, but there was controverting evidence upon which the jury found adversely to appellant.

This brings us to the conclusion that under the facts the contract is binding and enforceable. Our own statute of 1911 (article 6423) is persuasive in upholding such contracts as this. It provides that:

"Every railroad company chartered by this state, or owning or operating any line of railway within this state, shall keep and maintain permanently its general offices within the state of Texas at the place named in its charter for the locating of its general offices; and, if no certain place is named in its charter where its general offices shall be located, and maintained, then said railroad comany shall keep and maintain its general offices at such place within this state where it shall have contracted, or agreed, or shall hereafter contract or agree, to locate its general offices for a valuable consideration. * * * And such railroads shall keep and maintain their machine shops and roundhouses, or either, at such place or places as they may have contracted to keep them for a valuable consideration received," etc.

Appellant contends that this statute has no application, but, however that is, the city of Ennis having paid a valuable consideration, it evidently expected for the location and

maintenance of the division headquarters to remain at Ennis until public interest requires a change. We also are of the opinion that the proper judgment has been reached.

In support of our contention that the contract should be enforced we cite the following authorities: Tex. Rev. Stats. art. 6423; Acts 34th Leg. c. 20, p. 35; Railway Co. v. Robards, 60 Tex. 545, 48 Am. Rep. 268; Railway Co. v. Dawson, 62 Tex. 260; Railway Co. v. Malloy, 64 Tex. 607; Macdonell v. Railway Co., 60 Tex. 590; Williams v. Railway Co., 82 Tex. 553, 18 S. W. 206; Tyler v. Railway Co., 99 Tex. 491, 91 S. W. 1, 13 Ann. Cas. 911; Railway Co. v. Colburn, 90 Tex. 231, 38 S. W. 153; Railway Co. v. Anderson, 106 Tex. 60, 156 S. W. 499; Railway Co. v. Martin, 38 Tex. Civ. App. 379, 86 S. W. 25; Railway Co. v. Crandell, 75 Ark. 89, 86 S. W. 855, 112 Am. St. Rep. 42; Railway Co. v. Railway Co., 199 U. S. 160, 26 Sup. Ct. 19, 50 L. Ed. 134; Elec. Co. v. Glen Park Co., 155 S. W. 969; Child v. Railway Co., 213 Mass. 91, 99 N. E. 957, 48 L. R. A. (N. S.) 378; Taylor v. Railway Co., 54 Fla. 635, 45 South. 574, 16 L. R. A. (N. S.) 307, 127 Am. St. Rep. 155, 14 Ann. Cas. 472; Railway Co. v. Camp, 130 Ga. 1, 60 S. E. 177, 15 L. R. A. (N. S.) 594, 124 Am. St. Rep. 151, 14 Ann. Cas. 439.

The foregoing authorities, especially those by our appellate courts, sustain the principle that contracts made by railroad companies as herein in controversy are subject to enforcement by the courts, and cannot be abrogated unless the railroad companies show it is demanded by the interest of the public in discharging their duties to the public. This principle is clearly announced in the case of Railway Co. v. Camp, by the Supreme Court of Georgia, 130 Ga. 1, 60 S. E. 177, to be found in 15 L. R. A. (N. S.) 594, 124 Am. St. Rep. 151, 14 Ann. Cas. 439, in discussing the implied limitation imposed by law upon contracts for maintenance of tracks, stations, etc., wherein it is said:

"In applying what has been said to the present case, it cannot be held that the contract between the railroad company and the plaintiff was void per se, for the company had the right to make a contract with the plaintiff to locate a station at a given point, so long as the location of the station did not interfere with the proper discharge of the duties resting upon the company as a quasi public corporation; but the plaintiff was charged with notice of the character of the person he was contracting with, and of the duties which that person owed to the public, and also, in reference to the subject-matter of the contract, that it was connected intimately and directly with the discharge of the duties the defendant owed the public, and therefore it became a part of the contract between the parties that the maintenance of the station at the point was limited, not by the time specified in the contract, but to that time, and to that time only, when, consistent with the discharge of the public duties of the company, the station could be maintained in the manner provided for in the agreement. The petition therefore set forth a cause of action. There is nothing alleged to indicate that the conditions are so changed that the railroad company cannot comply with its contract, and at the same time discharge all

duties to the public, which the law places upon it. If that time has arrived, the railroad company may be allowed to show this by an appropriate plea, supported by competent evidence."

Under the issue submitted to the jury and which was supported by the evidence it was found by them that it was not necessary for the appellant to move the division headquarters from the city of Ennis in order to serve the interest of the public; hence we hold against appellant on that issue.

Appellant cites in support of its contention Railway Co. v. Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385, and practically relies upon that opinion for its support. Mr. Justice Brewer, who was a learned and a strong member of the Supreme Court of the United States, dissented from the majority rendering the opinion, and the case has been criticized and modified by other courts of high degree. Our Supreme Court has held to a different view from the principle announced by that case, and, as we are in accord with our courts, we will not follow the Marshall Case.

[3, 4] Appellant's third assignment of error is:

"The court erred in that part of this judgment in which the defendant was 'perpetually enjoined and restrained from ceasing to keep or maintain and from removing or causing to be removed from the city of Ennis' the following: '(e) The division terminus for all its trains operating into, through, or out of the city of Ennis, in Ellis county, Tex., and also the locomotives, cars, equipment, trainmen, conductors, brakemen, crews, and other employés which are used or are to be used and officials as are necessary in such division terminus operations or on trains so reconstituted at Ennis, Tex., traffic of an extraordinary or unusual nature and employés whose employments and runs are from Ennis to points north or from points north to Ennis being excepted'—

"(a) Because of the reasons already given.

"(b) Because, even if the contract upon which the plaintiffs rely was held to be perpetual, and it was held that this contract was binding upon the defendant, it nowhere contains any obligation requiring the defendant to maintain any character of train schedules or system or plan of running or changing crews or engines or fixing the end of the runs of its trainmen, and there is nothing in the contract which would prevent or prohibit the defendant from changing the run of its trains or of its train crews whenever and in whatever way it pleases.

"(c) Because the contract referred to did not bind or purport to bind the receiver or this defendant to keep (1) the 'trainmen, conductors, brakemen, crews, and other employés,' or (2) 'the locomotives, cars and equipment' referred to in this portion of the decree, at Ennis, and the injunction upon this defendant thus to do is entirely outside of and beyond the scope of the obligation mentioned.

"(d) The portion of the judgment quoted is indefinite and uncertain, and for a decree operating for all time to come is altogether wanting in that definiteness and certainty which is required, and is in this respect unreasonably burdensome and oppressive on the defendant, and is so indefinite and uncertain as to practically transfer the operation, direction, and control of the defendant's property at this point from its officers to the court.

"(e) Because the number and character and the run of trains is, and by nature of the business is required to be, constantly changing, and there was nothing in the contract of December 6, 1890, having to do, referring to, or covering additional trains which have been put on since that time, and which in all the time to come will be put on.

"(f) Because the enforcement of such a decree, or such a portion of this decree, involving, as it does, supervision of a situation constantly changing, is contrary to the usages and practice of the courts, and especially so where, as this decree purports to do, the order is to be perpetual in its extent.

"(g) Because it covers trains belonging not only to what was formerly the middle division, but to all parts of the defendant's property, provided only that they would pass through Ennis, as to which there is nothing in the contract.

"(h) There are no pleadings to support such a finding or decree.

"(i) There is no evidence to support the decree in this respect."

Several propositions are submitted under this assignment, which are, in substance: (1) If the contract sued on was held to be perpetual, it does not obligate the maintaining of "any character of train schedules or system or plan of running or changing crews or engines, or fixing the end of the runs of its trainmen," etc.; (2) nor does it obligate the "defendant to keep the trainmen, conductors, brakemen, crews, and employés, or locomotives, cars, equipment, or the officials as are necessary in such division terminus operations or on trains so reconstituted at Ennis"; (3) that the judgment is "indefinite and uncertain, and for a decree operating for all time to come is altogether wanting in the definiteness and certainty required, both as to what is meant by 'division terminus,'" and as to the equipment and employés, etc.; (4) there was nothing in the contract as to the number, character, and the run of trains, the nature of business required to be constantly changing, etc.; (5) the enforcement of such a decree, involving, as it does, supervision in the last analysis by the court of a situation intensely complicated and constantly changing, is contrary to usages and practice; (6) it covers trains belonging not only to what was formerly the middle division, but to all parts of the defendant's property, provided only that they pass through Ennis; (7) that the keeping and maintaining of said "division headquarters" for 23 years at Ennis was a sufficient compliance with the contract; (8) "the judgment in the particulars here complained of is supported neither by the contract nor by the finding of the jury."

The first part of the judgment properly construes the contract, and then particularizes how it is to be observed, and it is not erroneous. Under the contract the railway company was to maintain its division headquarters at Ennis, and under the evidence it was shown that by such a provision, quoting from the testimony of Cecil Faris, is meant:

"The meaning of that term is clearly the head of the division, 'where the superintendent's office and roundhouses and division terminal are, and include the superintendent's office and the

dispatcher's office and lay-over for crews, where the crews change ordinarily; also the repair shops for the cars and engines, sometimes, the roadmaster and the roundhouse.' If I were going to define the term 'division headquarters,' I would say it includes the superintendent's office and his assistants, the dispatcher's office and their necessary forces or clerks necessary to handle the division, the roundhouses and repair shops. It would also include the conductors, brakemen, firemen, and engineers that would stop there at the division terminal. My definition of the 'division headquarters' sometimes means all of the conductors, all of the firemen, brakemen, engineers, all of the superintendent's forces, dispatcher's forces, all of the employés of the roundhouses, employés of the machine shops, and the roadmaster, and ordinarily takes in the section foreman. A division terminal is where the crews lay over."

Construing the judgment as a whole, it is only intended to compel the railroad company to enforce the contract according to its legal effect, that is, that the railroad company should continue as it had done, to keep and maintain its division headquarters at Ennis in a reasonable and consistent manner, and the particularization of judgment was placed therein to guard against the violation thereof, and, as contended by appellees' counsel:

"It is apparent that the paragraph of the judgment complained of does not undertake to fix the character of appellant's train schedules nor its system or plan of running or changing crews or engines, nor the length of train runs, etc., as asserted in appellant's first proposition. It simply undertakes substantially to preserve only the division terminus operations and all of the equipment and employés that are referred to in it, viz. those only which 'are necessary in such division terminus operations,' or on trains which make Ennis their division point for being reconstituted, and that even those admonitions are expressly limited so as to exclude therefrom traffic, equipment, and employés which might preferably be handled at points north of Ennis, this exception being provided in order that the decree might not be thought to cover more than the former middle division."

The enjoining appellant from discontinuing its division terminus operations is not indefinite or uncertain, and it can conform to it substantially by proper effort; nor is it so intensely complicated as to require the supervision of the courts, if the railroad company makes a bona fide effort to comply with the terms of the contract. There being no time fixed in the contract for its termination, it was not error in the court to construe it to run perpetually; the evidence showing that the public interest demanded no change.

[5] There is no error in the terms that "enjoining and restraining the railroad company perpetually from ceasing to keep or maintain and from removing or causing to be removed from the city of Ennis the superintendent and assistant superintendent of trains and chief dispatchers with their officers and office forces described in the judgment." By the terms of the contract the railroad company was to "establish and maintain division headquarters at Ennis," and according to the evidence such employés

were included in the necessary maintaining of headquarters at Ennis, and the court properly so held. The middle division of the Houston & Texas Central Railroad Company mentioned in the contract and referred to in the judgment was fixed by the authorities of the road to run from the tract of land on which the machine shops are located about a mile just north of Ennis and extending south to Hearne, Tex., and Ennis has ever since that time remained the division arrangement from Hearne to Ennis and from Ennis to points north and west, and with slight modification Ennis has been the administrative point for handling train movements through the system from Hearne north to Denison, and northwest to Ft. Worth. In construing the contract the court properly construed the middle division, and the judgment properly protects the railroad company's interest in this language, the requirements of the system north of Ennis, "in case the railroad shall desire to set up divisional administration of them at some point north of Ennis."

[6] By their ninth assignment appellants complain that:

"The court erred in that part of its judgment in which it ordered that this defendant, 'its successors and assigns, do now and continuously hereafter keep and maintain in the city of Ennis, in Ellis county, * * * in perpetuity, its division headquarters, machine shops, and roundhouses for that portion of its railway system which composed the former middle division of said railroad company, all comprising and including the departments, facilities, employés, organization, etc., of said portion of its railway system as follows:' [the giving six paragraphs, lettered respectively (a), (b), (c), (d), (e), and (f), which lettered paragraphs are identical with paragraphs of said decree of the same letters copied herein]—

"(a) Because of the reasons for refusing to grant a specific performance of the contract already given.

"(b) Becuase the language here quoted is vague, indefinite, and uncertain, and is not of that definiteness and certainty which is required of a decree in the nature of one of specific performance, and all the more deficient in this respect in such a decree which purports to continue for all time to come.

"(c) Because each of the lettered paragraphs is erroneous for the reasons stated with respect to each respectively heretofore given herein, and defendant prays leave to refer to said reasons in this connection."

Under this assignment three propositions, as follows, were submitted:

First. "If it were a proper construction of the contract that the receiver agreed to establish the division headquarters, machine shops, and roundhouse at Ennis, and never move them therefrom, such a contract embracing what was found by the court below to be embraced therein, would, except as to the machine shops and roundhouse, an exception as to which has been specially made by statute, be incapable of being ordered to be specifically performed, because not capable of present performance, and requiring the constant supervision of the court."

Second. "If it were a proper construction of the contract that the receiver agreed to establish the division headquarters, machine shops, and roundhouse at Ennis, and never move them therefrom, such a contract embracing what was

found by the court below to be embraced therein, would, except as to the machine shops and roundhouse, an exception as to which has been specially made by statute, be incapable of being ordered to be specifically performed, because appellees have an adequate remedy at law."

Third. "If it were a proper construction of the contract that the receiver agreed to establish the division headquarters and machine shops and roundhouse at Ennis, and never move them therefrom, the contract, as construed by the court below, is too indefinite and uncertain to be made the basis of a decree for specific performance."

Under the circumstances of this case we are of the opinion that the lower court properly rendered a decree of specific performance. In this state our courts have jurisdiction of both law and equity, and if there is no remedy at law for its enforcement, we are of opinion that a remedy existed in equity for specific performance of the contract. Tyler v. Railway Co., 99 Tex. 491, 91 S. W. 1, 13 Ann. Cas. 911; Railway Co. v. Anderson County, 150 S. W. 239; Railway Co. v. Anderson County, 106 Tex. 60, 156 S. W. 499; Railway Co. v. Anderson County, 174 S. W. 305; Mosel v. Railway Co., 177 S. W. 1048; Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843; Railway Co. v. D. & R. G. Railway Co., 143 U. S. 596, 12 Sup. Ct. 479, 36 L. Ed. 277; Telegraph Co. v. Harrison, 145 U. S. 459, 12 Sup. Ct. 900, 36 L. Ed. 776; Union Pacific Co. v. Railway Co., 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265; Schmidtz v. Railway Co., 101 Ky. 441, 41 S. W. 1015; Railway Co. v. Franklin, 96 Va. 693, 32 S. E. 485, 44 L. R. A. 297.

In Tyler v. Railway Co., supra, we have a case in line with the instant one. Mr. Justice Brown in that case, in speaking for the court, says:

"The St. Louis Southwestern Railway Company of Texas contends that the courts should not undertake to enforce the specific performance of the contract made in this case, because it would involve the oversight and control of the road by the court, for which purpose the road is not properly equipped. There is no difficulty in enforcing the specific performance of this contract; the judgment of this court perpetuating the writ of injunction heretofore issued in this cause will have the effect to prevent the removal by the St. Louis Southwestern Railway Company of Texas of its general offices and its machine shops and roundhouses for its main line from the city of Tyler, and we apprehend that no compulsory process of the court will be required to secure the maintenance and operation of the general office, machine shops, and roundhouses as thus located; nor will there be necessity for the oversight and supervision of any judicial or executive officer of the state in the operation thereof.

"It is claimed that the enforcement of such contracts as that sought to be enforced in this case would be against the public policy of the state. On the contrary, to enforce the statute of the state, as will be done in this case, will be to enforce the public policy of the state, as declared by the Legislature in the enactment of article 4367. There is no public policy nor public interest to which courts may give precedence over a valid statute enacted by the legislative department."

In Schmidtz v. Railway Co., supra, on the question of specific performance the court say:

"It seems clear to us that there is no adequate relief for the bondholders to be had, except by a specific enforcement of the contract; hence the important question to be considered is the power of the court to enforce specifically the contract, and whether the same, in equity, should be enforced. As before said, there is some authority cited which sustains the contention of appellee that courts of equity cannot or ought not to specifically enforce a contract requiring skill and long or continuous supervision of the court, but it is insisted by appellant that the weight of recent decisions sustains its contentions that such contracts can and ought to be enforced, and he cites several decisions in support of this contention, among which is," etc. (citing and discussing numerous important cases).

"It seems to us that the weight of modern authorities sustains the contention of appellant, and a court of equity can enforce specific performance of the contract under consideration. It is pretty well known history of the country that many railroads, and for long terms, have been operated under the direct supervision and control of courts of equity. It does not seem to us that it would be difficult to enforce specific execution of the contract under consideration. The court may enforce its orders by attachment or rule according to equity practice, or, if deemed best, it might place the road in the hands of a receiver."

Appellants' tenth assignment of error and the proposition thereunder are:

"The court erred in not entering judgment in favor of the defendant because the plaintiffs, for reasons above pointed out, were not entitled to a judgment of specific performance with respect to the facilities referred to in the petition, other than the shops and roundhouse, and were not entitled to a decree of specific performance with respect to these, for the same reasons, and for the further reason that the contract upon which the plaintiffs rely is not the contract of a railroad company but that of the receiver of such company, and the statute upon which the plaintiffs rely is not applicable."

Proposition: "In the absence of such a statute as article 6423, specific performance of a contract with respect to the location of machine shops and roundhouses should not be decreed, and specific performance of that part of the contract upon which the plaintiffs rely should not be decreed, because it is not the contract of a railroad company, but of a receiver, and is not covered by the article referred to."

[7] The contract sued on, as heretofore shown, was made by Dillingham, receiver of the Houston & Texas Central Railway Company, with the city of Ennis on December 6, 1890. The said road was sold by order of the federal court to one Olcott. Prior to that time, in 1888, the court had decreed said road delivered to him, and after the sale, at the solicitation of Olcott, two of the receivers were discharged, and Dillingham retained and kept possession of the property, and so remained in possession, controlling, managing, and operating same, until his discharge in December, 1893. In the meantime, after the road was bought in and ordered delivered to Olcott, he procured three orders from the court for delays, postponing from time to time the delivery, which continued until Dillingham was discharged. The fed-

eral court on December 24, 1890, decreed in passing on the motion to delay in delivering the property to Olcott, among other things, as follows:

"It is further ordered that such property nevertheless shall be delivered and received by said Olcott, or his assigns, subject to and charged with the obligations and liabilities contractual or resulting from torts or otherwise incurred by the receiver or receivers appointed by this court in the above-entitled cause and as the same may be fixed and determined by this court, and also subject to the right which this court reserves to charge upon the property or any part thereof."

Olcott and his associates formed a corporation for the purpose of taking over said Houston & Texas Central Railway Company under their purchase, and it was chartered under the name of Houston & Texas Railroad Company, under which name the defendant railroad company has been operating ever since. Olcott having purchased the property under an order of the court and allowing it to remain in the hands of Dillingham and be operated and handled for Olcott's convenience and advantage, Dillingham became his agent, and the appellant Railroad Company is liable for the contracts made by the receiver in relation to the appellant road. Bath v. Railway Co., 17 Tex. Civ. App. 697, 44 S. W. 595; Railway Co. v. Crawford, 88 Tex. 277, 31 S. W. 176, 28 L. R. A. 761, 53 Am. St. Rep. 752; Railway Co. v. Strycharski, 168 U. S. 706, 18 Sup. Ct. 943, 42 L. Ed. 1213.

[8] It is assigned as error, and the proposition submitted thereunder, that:

"The court erred in not sustaining the plea of the defendant to the jurisdiction of the court as the same appears in the second amended original answer of the defendant, and in other pleadings of the defendant, the undisputed evidence showing that the allegations made in said plea are true."

Proposition: "Appellant had the right to have the question of its liability, if any, growing out of the contract of the receiver dated December 6, 1890, determined by, and only by, the United States District Court for the Southern District of Texas, as the successor of the United States Circuit Court for the Eastern District of Texas, and the plea to the jurisdiction of the district court of Ellis county should have been sustained."

Appellant's plea to the jurisdiction of the district court of Ellis county, which tried this case, contends that jurisdiction was held by the United States Circuit Court for the Eastern District of Texas in consolidated cause No. 198, styled Nelson S. Easton v. James Rintoul, Trustee, et al., in which Dillingham was one of the receivers. It makes various statements of different orders made by said United States court, and that said court retains jurisdiction to adjudicate all suits in relation to controversies over contracts made by the receivers of that court. One order made by the United States court was as follows:

"It is further ordered that such property nevertheless shall be delivered to, and received by, said Olcott or his assigns, subject to, and charged with, the obligations and liabilities, con-tractual or resulting from torts, or otherwise, incurred by the receiver or receivers appointed by this court in the above-entitled cause, and as the same may be fixed and determined by this court."

Various other orders were made in relation to claims affecting receivers in said suit. On March 21, 1900, in order for final and complete settlement, after notice was given by said court, it made provision with reference to reserved jurisdiction as follows:

"And all controversies in this cause having been finally determined, the same is hereby closed, and no further petitions, motions, or other applications shall be filed in this cause, except upon due notice to the complainants, defendants, and to the purchaser, Frederick P. Olcott, followed by order of the court granted after such notice."

Said order also provided:

"Charles Dillingham shall be and without further order stand finally relieved and discharged as receiver herein, and thereupon, and without further order, his bond or bonds as receiver herein shall be canceled, and he and his sureties upon such bonds shall be and thereupon become finally and forever discharged of and from all further obligation or liability on such bond or bonds."

No further action was taken in said cause until after this suit was brought in Ellis county, when appellants, on June 7, 1915, filed a "supplemental bill" in the said United States court, making appellees defendants and seeking an injunction to prevent appellees from prosecuting this suit in Ellis county. This plea was disposed of by the said United States court at a hearing on June 28, 1915, by denying the injunction for want of jurisdiction.

[9] The appellees in this suit were never parties to the receivership suit in the United States court, and that court having, in 1900, finally closed said suit, and having theretofore, in 1893, discharged the receiver, and all matters pertaining thereto before the court having been disposed of, the court, by way of precaution, retained jurisdiction to adjudicate any claim that might affect the action of the receiver. No such matter for over 20 years affecting the receiver arose, nor does the controversy herein involve him, but said controversy involves only the appellants and appellees and the district court of Ellis county had jurisdiction to adjudicate it. Further, the railroad company is estopped from making any claim of exclusive jurisdiction in the United States court by an act of the state Legislature enacted in 1889, from which it obtained its charter, and waived its right to make such a plea. Chapter 24, p. 19.

[10] Again, appellants, if entitled to the exclusive right of being sued in the federal court, waived such right by not presenting such plea in time. The record shows that:

"Appellant's plea to the jurisdiction of the state court setting up its claim that the federal courts had exclusive jurisdiction over it was submitted to the court and determined June 11, 1915. No facts are shown to have been then presented to the court, and no bill of exception

was preserved. The remainder of the case was thereupon continued without prejudice to appellant's plea of privilege and plea of misjoinder. Plaintiff's second amended original petition, omitting all particular reference to the order of December 24, 1890, was filed June 14, 1915. Cause was continued for the November term, 1915, by order dated November 11, 1915, by agreement of parties, with the same reservation of rights as contained in the order of June 11, 1915. Plaintiff's third amended original petition was filed January 10, 1916. The cause was tried upon this petition. Appellant's second amended original answer was filed January 10, 1916. The cause was tried upon this answer. In it appellant again asserted its plea of federal jurisdiction, its plea of privilege, its pleas of misjoinder, and its answers to the merits. At the trial of the cause, on January 25, 1916, appellant filed motion, praying the court to sustain its plea asserting exclusive federal jurisdiction, as contained in 'its second amended original answer, filed herein on January 10, 1916.' It bears notation as follows: 'Motion presented in due time and same overruled, to which defendant excepts. F. L. Hawkins, Judge.' No bill of exceptions on this point was preserved. The final judgment, referring to said plea to the jurisdiction, recited 'that the same and each and all of them, including the plea to the jurisdiction and the plea of privilege, should be and are overruled, to which the said defendants each except.'"

See Revised Statutes, arts. 1902, 1909, 1910; Rule 7, District and County Courts; Townes' Texas Pleadings (2d Ed.) pp. 517–529; Railway Co. v. Harlan, 62 S. W. 971.

[11] Appellant complains that:

"The court erred in refusing to sustain the plea of privilege of the defendant, as the same appears in the second amended original answer, and the other pleadings of the defendant: (1) Because the pleadings of the plaintiff and the undisputed evidence show said action to be a suit for injunction, and not a suit for specific performance; (2) because the individual defendants herein, who are residents of Ellis county, are neither necessary nor proper parties to this suit, and are not such parties as would draw the venue of this suit to the county of their residence, and thereby deprive the defendant of its privilege to be sued in Harris county, Tex., the county of its residence; (3) because the undisputed evidence shows that the individual defendants were fraudulently made parties defendant herein for the purpose of fixing the venue of this suit in Ellis county."

The purpose of this suit is to enforce the contract sued on, and the writ of injunction is but an ancillary proceeding, and, as contended by appellant, the injunctive venue statute (article 4653) does not necessarily control, but jurisdiction was given under article 1830. Railway Co. v. Anderson County, 150 S. W. 239; Tyler v. Railway Co., 99 Tex. 491, 91 S. W. 1, 13 Ann. Cas. 911.

The individual defendants resided in Ellis county, and the evidence showing Costello to be a proper party, and the other individuals having been dismissed, it renders the question of being fraudulently made parties unimportant, as jurisdiction was properly attached in that county.

Quite a number of assignments of error have been presented that we have not discussed, but all have been considered, none of which do we believe of such gravity as to require a reversal of the case.

We consider the evidence sufficient to support the judgment of the lower court, and it is affirmed.

Affirmed.